**In re COCOLAT, INC., etc., Debtor.**

**COCOLAT, INC., Plaintiff,**

**v.**

**FISHER DEVELOPMENT, INC., etc., Defendant.**

**Bankruptcy No. 94–42440 T.
Adv. No. 94–4145 AT.**

United States Bankruptcy Court,
N.D. California.

Jan. 11, 1995.

---

Brett B. Curlee, Hill, Farrer & Burrill, Los Angeles, CA, for plaintiff.

Stewart Stone, Jr., Steinhart & Falconer, San Francisco, CA, for defendant.

## MEMORANDUM OF DECISION

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

Plaintiff Cocolat, Inc. ("Cocolat") seeks to avoid as a preference a $10,000 payment (the "$10,000 Payment") made to defendant Fisher Development, Inc. ("Fisher") before the commencement of the above-captioned bankruptcy case. Fisher denies that the transfer

was preferential. Fisher also claims defenses pursuant to 11 U.S.C. §§ 547(c)(1), (2), and (6). The Court concludes that the transfer was preferential and that Fisher has failed to establish a defense under either 11 U.S.C. § 547(c)(1) or (6). However, the Court concludes that the $10,000 Payment was made in the ordinary course of business under 11 U.S.C. § 547(c)(2). As a result, judgment will be entered in favor of Fisher.

## SUMMARY OF FACTS

Most of the relevant facts are undisputed. Prior to and during the early portion of 1993, Cocolat manufactured and sold candy, primarily through retail stores. During the Fall of 1992, Fisher, a licensed contractor, agreed in writing to construct certain improvements for a retail store at Embarcadero Center in San Francisco, California (the "San Francisco Store") for Cocolat.[1]

Before Fisher began work, Cocolat's Chief Financial Officer, Rachelle Titterington ("Titterington"), attempted to renegotiate the contract terms as to when payments would be due. Fisher's Vice President and Chief Financial Officer, Dennis Alfaro ("Alfaro"), refused to modify the written agreement but assured Titterington that Fisher would "work with" Cocolat.

Construction on the San Francisco Store was completed sometime between December 4 and 10, 1992.[2] In January 1993, Alfaro called Titterington to inquire why a payment had not been received when due and when Fisher could expect to receive it. Titterington promised the payment by a date certain. Fisher received the payment as promised.

When a subsequent payment was not received when due, Alfaro again called Titterington. This time, initially, Titterington declined to specify a payment date. Alfaro indicated that this was unacceptable. He noted that, unless satisfactory terms could be

---

1. Fisher and Cocolat did not have a long established business relationship. Fisher performed only one other project for Cocolat. This other project was begun and completed somewhat before the San Francisco Store. Fisher was paid in full for its work on the other project although payment was also made late in that instance.

2. There was a factual dispute as to the precise date on which work on the San Francisco Store was completed. As discussed below, the Court need not resolve this dispute to determine the issues presented.

agreed upon, Fisher would be forced to record a mechanics' lien to protect itself.

Thereafter, on January 29, 1993, Fisher and Cocolat agreed on a payment schedule (the "Payment Schedule") for the balance of the debt. The Payment Schedule required the balance of the debt to be paid in installments over the following few weeks. The payments were timed so that the balance of the debt would be paid in full before Fisher's time to record its mechanics' lien had expired.

On or about February 2, 1993, Fisher received the first payment under the Payment Schedule—the $10,000 Payment. When the second payment was not received when due, on February 10, 1993, Alfaro called Titterington and warned her that, if the payment were not received immediately, a mechanics' lien would be recorded. This warning was confirmed by letter the next day. No further payments were received. On March 5, 1993, Fisher recorded a mechanics' lien.

About a month later, on April 6, 1993, certain creditors filed an involuntary petition against Cocolat seeking relief under chapter 7 of the Bankruptcy Code. An order for relief was subsequently entered. However, the case was converted to chapter 11 of the Bankruptcy Code. In due course, a liquidating plan of reorganization was confirmed. Cocolat is prosecuting this avoidance action pursuant to that plan.

## DISCUSSION

### A. WAS THE $10,000 PAYMENT A PREFERENCE?

■ Section 547(b) provides, in pertinent part, as follows:

... the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

. . . . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Fisher disputes two elements of Cocolat's main case. Fisher disputes that the $10,000 Payment was made on account of an antecedent debt. 11 U.S.C. § 547(b)(2). Fisher also disputes that the $10,000 Payment gave Fisher more than it would have received had the payment not been made and had Cocolat instead been liquidated in a chapter 7 case. 11 U.S.C. § 547(b)(5). Neither contention has merit.

Under the facts recited above, it cannot reasonably be contended that the $10,000 Payment was not made on account of an antecedent debt. Fisher may feel compelled to dispute this element to preserve its claim to a defense under 11 U.S.C. § 547(c)(1). It may suppose that, if a payment is made on account of an antecedent debt, it may not also be made in exchange for "new value." This is clearly not true. No defense need be claimed unless a preference has been established. If a payment could not be both on account of an antecedent debt and in exchange for "new value," the defense of 11 U.S.C. § 547(c)(1) could never be invoked.

The basis for Fisher's dispute of the final element of Cocolat's main preference case appears closely related to Fisher's 11 U.S.C. § 547(c)(1) and (6) defenses. Fisher contends that it had valuable mechanics' lien rights which it relinquished when the $10,000 Payment was made. Had Fisher not received the $10,000 Payment, it would have exercised those rights and obtained payment in full. Cocolat contends that those rights had no value or at least a value less than the $10,000 Payment.

■ Cocolat has the burden of proof on this issue. 11 U.S.C. § 547(g). Cocolat has met that burden. In determining whether a transfer gives a creditor more than it would

have received in the event of a chapter 7 distribution, it must be assumed that the chapter 7 case would have been filed and the distribution made on the date the actual bankruptcy case was commenced—i.e., on April 6, 1993. *In re Tenna Corp.*, 801 F.2d 819, 821–24 (6th Cir.1986); *In re Ludford Fruit Prods., Inc.*, 99 B.R. 18, 24 (Bankr. C.D.Cal.1989). The Court must decide whether Fisher would have had an enforceable mechanics' lien worth at least $10,000 on April 6, 1993 had Fisher not received the $10,000 Payment on February 2, 1993.

As noted above, Fisher recorded a mechanics' lien on March 5, 1993. Naturally, the lien claim did not include the portion of the debt satisfied by the $10,000 Payment. However, it is safe to assume that, had the $10,000 Payment not been made, this portion of the debt would have been included in Fisher's mechanics' lien claim. Cocolat contends that the mechanics' lien claim was recorded too late, that work on the San Francisco Store was completed on December 4, 1992, and that the last day to record a mechanics' lien was March 4, 1993. As noted above, Fisher's lien was recorded on March 5, 1993.

Fisher contends that work was not completed until December 10, 1992, and that the lien was timely. The evidence presented was insufficient to permit the Court to resolve this issue. Since Cocolat has the burden of proof on this issue, if a determination of this issue were essential to the Court's decision, the Court would conclude that no preference had been established. However, the Court concludes that Cocolat has established the final element of its preference case for another reason.

Even if Fisher's mechanics' lien was recorded within the prescribed time, Fisher's rights had no value because the collateral for the lien—Cocolat's lease of the premises where the San Francisco Store was located (the "Lease")—had no value as of April 6, 1993. Conflicting evidence was presented as to the value of the Lease. Titterington testified that Cocolat had spent approximately $200,000 for capital improvements at the San Francisco Store. She also testified that she had heard that the Store was "doing well."

However, Kimberly Schuster ("Schuster"), Cocolat's Controller, testified that the San Francisco Store never generated a net monthly profit except possibly during February 1993. Titterington and Schuster agreed that Cocolat considered it important to keep the San Francisco Store open, at least for the time being, to generate revenues and to give its business consultant time to evaluate the feasibility of Cocolat's reorganization plan.

If the Court were persuaded that Cocolat had a viable business on April 6, 1993, then the necessity of the Lease for the continuation of that business might be enough to give it value. However, persuasive evidence was presented that, when the involuntary petition was filed, Cocolat was several months in arrears on the rent and was in the process of being evicted. After the bankruptcy was filed, the Lease was not assumed and was thus deemed rejected. 11 U.S.C. § 365(d)(4). The weight of the evidence compels the Court's conclusion that the prompt demise of Cocolat's business was virtually certain on April 6, 1993 and that the Lease had no value on that date.

Fisher contends that, even if its mechanics' lien rights in the Lease were not valuable, by accepting the $10,000 Payment, it also gave up lien rights in the underlying real property. These lien rights undoubtedly had value. This argument must fail. Cocolat did not own the underlying real property. A creditor receives a preference whenever it receives more from the challenged transfer than it would have received in a liquidation of the *debtor's estate*. It is irrelevant to this determination that a creditor might have been assured of payment in full from some other source. *In re Virginia–Carolina Financial Corp.*, 954 F.2d 193, 198–99 (4th Cir.1992). Consequently, Fisher's position is not aided by the fact that Cocolat might have been paid in full by the owner of the real property (the "Owner") had it not received the $10,000 Payment and Cocolat had instead been liquidated.

**B. WAS THE $10,000 PAYMENT MADE IN EXCHANGE FOR NEW VALUE?**

Fisher asserts a defense under 11 U.S.C. § 547(c)(1). Section 547(c)(1) provides as follows:

The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for *new value* given to the debtor; and

(B) in fact a substantially contemporaneous exchange; [emphasis added]

"New value" is defined in 11 U.S.C. § 547(a)(2) as follows:

... money or money's worth in goods, services or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

The release of a lien that has already been recorded on the debtor's property clearly qualifies as "new value" within the definition recited above, whether the release is effected by the creditor receiving the preferential transfer or by a third party. *Matter of Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224, 229–30 (5th Cir.1988); *In re George Rodman, Inc.*, 792 F.2d 125, 127–28 (10th Cir.1986).

Some courts have refused to extend this principle to include the release of the *right* to record a lien in the debtor's property: i.e., where the lien had not previously been recorded. *Cimmaron Oil Co., Inc. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1009 (N.D.Tex.1987). There does not appear to be any controlling authority on this issue in this Circuit. *See In re Nucorp Energy, Inc.*, 902 F.2d 729, 732 n. 3 (9th Cir.1990). Like the *Nucorp* court, the Court concludes that, for other reasons, Fisher cannot establish a § 547(c)(1) defense. As a result, the Court need not decide whether such a release may constitute "new value" within the meaning of 11 U.S.C. § 547(a)(2).

As noted above, Fisher bases its § 547(c)(1) defense on the same legal theory underlying its dispute of the final element of Cocolat's main preference case. There are two differences between the issues as they are presented in the two contexts. First, Fisher is entitled to a defense under § 547(c)(1) if the Court determines that the Lease had a value at least equal to the amount of the $10,000 Payment. The same determination would have defeated the final element of Cocolat's main preference case. However, in the context of the § 547(c)(1) defense, value must be determined as of the date of the $10,000 Payment—February 2, 1993. In the context of Cocolat's main case, the value must be determined on the date the petition was filed—April 6, 1993. *Nucorp Energy,*, 902 F.2d at 732–33; *In re Robinson Bros. Drilling, Inc.*, 877 F.2d 32, 33–34 (10th Cir.1989). Second, Fisher has the burden of proof on this issue in the context of the § 547(c)(1) defense. Cocolat must prove this issue in its main case. 11 U.S.C. § 547(g).

However, the result is the same. The Court is persuaded that the Lease had no more value on February 2, 1993, than it did on April 6, 1993. Titterington's and Schuster's testimony makes it clear that, by January 1993, Cocolat was in dire financial straits. The clearest sign of this was that it was unable to pay even its most essential bills on a timely basis—i.e., the rent *and* the mechanics' lien claims.

Cocolat may have believed that it could survive and may have placed great subjective value on the Lease. However, this is not sufficient to establish that the Lease had any tangible value from a creditor's point of view. Since the Court concludes that the Lease had no tangible value as of February 2, 1993, Fisher did not give Cocolat anything of value by relinquishing its right to record a mechanics' lien against the Lease.[3]

Fisher also contends, as it did in connection with the final element of Cocolat's main preference case, that the release of its mechanics' lien rights constituted "new val-

**3.** Cocolat also contends that Fisher's release of its mechanics' lien rights does not constitute "new value" under 11 U.S.C. § 547(c)(1) because Fisher's rights were "waived" or "extinguished" when Fisher accepted the $10,000 Payment. This argument merely substitutes other terms for the term "release." None of the cases cited by Cocolat in support of this theory are on point.

ue" because its mechanics' lien rights extended to the underlying real property which undoubtedly had value. Fisher's argument fails in this context too. The purpose of the "new value" defense is to protect transactions that do not result in a diminution of the bankruptcy estate. A transfer does not diminish the estate if the estate receives "new value" on account of and equal to the amount of the transfer. *In re Jet Florida Sys., Inc.*, 841 F.2d 1082, 1084 (11th Cir.1988); *Fuel Oil Supply & Terminaling*, 837 F.2d at 228. "New value" given to a third party does not prevent a diminution of the bankruptcy estate.

However, Fisher contends that value given to a third party may constitute "new value" within the meaning of §§ 547(a)(2) and (c)(1) under these circumstances. In support of this position, Fisher relies on *Matter of Anderson Plumbing Co.*, 71 B.R. 19, 20 (Bankr.E.D.Cal.1986). In *Anderson*, the claimant was a materials supplier on a public works project. The *Anderson* court noted that, had the claimant not been paid by the subcontractor debtor, the claimant could have asserted a claim against the payment bond surety. Ultimately, a claim for indemnification would have been asserted against the debtor. The *Anderson* court based its finding of "new value" on the elimination of this indemnification claim. *Anderson*, 71 B.R. at 20. Fisher contends that, as in *Anderson*, if the Owner of the underlying real property had been required to pay Fisher the $10,000 Payment instead of Cocolat, the Owner would have had an indemnification claim against Cocolat. The elimination of this claim should qualify as "new value."

Cocolat contends that *Anderson* was incorrectly decided. It further contends that the cases upon which *Anderson* relied have been discredited. In support of this position, it

cites *Angeles Electric Co. v. Superior Court*, 27 Cal.App.4th 426, 438, 32 Cal.Rptr.2d 660, 668 (1994), *rev. denied* (Nov. 3, 1994), a case construing a state statute patterned after § 547. *Angeles Electric* contains a lengthy discussion of this issue and quotes *In re Chase & Sanborn Corp.*, 904 F.2d 588, 596 (11th Cir.1990) which describes the rationale of the cases relied upon by *Anderson* as engaging in "circular and ill-founded evasion of the policy against preferential transfers." *Angeles Electric*, 27 Cal.App.4th at 439, 32 Cal.Rptr.2d at 668.

Cocolat and the *Chase & Sanborn* court are correct. The *Anderson* rationale does not sustain close scrutiny. The release of a lien enlarges the estate from the point of view of unsecured creditors. Thus, a payment made in exchange for the release of a lien of equal amount does not diminish the estate. By contrast, the elimination of a claim against the estate does not similarly enlarge the estate. Courts have consistently rejected preference defendants' contentions that the "release" of their unsecured claims to the extent of the payments received constituted "new value" under 11 U.S.C. § 547(a)(2). *In re Chase & Sanborn Corp.*, 904 F.2d at 595–96.[4] The estate receives no more new value from the elimination of an unsecured claim of a third party than it does from the elimination of the unsecured claim of the preferred creditor.

## C. IS FISHER ENTITLED TO A DEFENSE UNDER 11 U.S.C. § 547(c)(6)

Fisher also claims a defense under 11 U.S.C. § 547(c)(6). Section 547(c)(6) provides as follows:

The trustee may not avoid under this section a transfer—

---

4. The *Angeles* court improperly includes within this line of discredited cases *In re E.R. Fegert, Inc.*, 88 B.R. 258 (9th Cir. BAP 1988). *Angeles Electric*, 27 Cal.App.4th at 437, 439, 32 Cal. Rptr.2d 660. In *Fegert*, the agency for whom the contract was being performed held retention funds due to the debtor under the contract. Had the subcontractor asserted a claim against the surety, the surety would have had the right to an equitable lien against these funds. Under these circumstances, the preference defendant's re-

lease of its claim against the surety resulted in the release of a potential *secured* claim against the debtor's property, thereby freeing up property for the benefit of the debtor's unsecured creditors. Such a release was properly viewed as "new value." The *Angeles* court does not appear to have noted this differentiating fact. It also failed to note that the bankruptcy appellate panel's decision in *Fegert* was affirmed by the Ninth Circuit. *See In re E.R. Fegert, Inc.*, 887 F.2d 955, 958–59 (9th Cir.1989).

(6) that is the fixing of a statutory lien that is not avoidable under section 545 of this title; ...

Fisher contends that, because it had statutory mechanics' lien rights at the time the $10,000 Payment was received, § 547(c)(6) bars avoidance of the $10,000 Payment. This argument must also fail.

On its face, § 547(c)(6) does not appear to protect preferential transfers of money. It appears to protect only avoidance of statutory liens. Nevertheless, some courts have applied this defense to protect *payments* made to creditors with unavoidable statutory lien rights. As stated in *Cimmaron Oil,* 71 B.R. at 1010:

> Although the language of § 547(c)(6) arguably applies only to the *fixing* of a lien, the legislative history reflects Congress' intent that § (c)(6) also exempt from the trustee's avoiding power "transfers in satisfaction of such liens." S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5874; H.R.Rep. No. 595, 95th Cong., 1st Sess. 374, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6330.

*See also Nucorp Energy,* 902 F.2d at 733–34 (holding that debtor's payments to contractor were not protected from avoidance by 11 U.S.C. § 547(c)(6) where time to record a mechanics' lien had expired and no lien had been recorded).

Notwithstanding *Cimmaron* and *Nucorp,* the Court is skeptical that the language of § 547(c)(6) should be strained to apply to payments on a statutory lien, rather than the "fixing" of the lien itself. However, even if § 547(c)(6) may be applied in this nonliteral fashion, it would not protect the $10,000 Payment from avoidance. The critical question under either § 547(c)(1) or (6) is whether Fisher's lien rights had value at the time the $10,000 Payment was made. The Court has concluded that they did not. For this reason, Fisher is no more entitled to a defense under § 547(c)(6) than under § 547(c)(1).

### D. IS FISHER ENTITLED TO A DEFENSE UNDER 11 U.S.C. § 547(c)(2)?

 Fisher also claims a defense under 11 U.S.C. § 547(c)(2)—the ordinary course of business defense. Section 547(c)(2) provides as follows:

> The trustee may not avoid under this section a transfer—
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms;

Fisher can easily satisfy the first element of this defense. The debt was clearly incurred in the ordinary course of business. However, the latter two elements are disputed. Fisher contends that the $10,000 Payment was also made in the ordinary course of business according to ordinary business terms. Cocolat disputes this contention.

 Whether a payment was made in the ordinary course of business is judged by a subjective standard—i.e., whether the parties themselves considered the transaction ordinary. Whether the payment was made according to ordinary business terms is judged by an objective standard—i.e., whether the relevant industry would consider the payment to have been made according to ordinary business terms. *In re Fred Hawes Org., Inc.,* 957 F.2d 239, 244 (6th Cir.1992); *In re Loretto Winery, Ltd.,* 107 B.R. 707, 709–10 (9th Cir. BAP 1989).

 The subjective test must be determined based on the facts of the particular case. *Fred Hawes,* 957 F.2d at 244. The factors frequently considered are:

> ... 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or the form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activity; and, 4) whether the creditor took advantage of the debtor's deteriorating financial condition. [Citation omitted.]

*In re Grand Chevrolet, Inc.,* 25 F.3d 728, 732 (9th Cir.1994). *See also In re Food Catering*

*& Housing, Inc.,* 971 F.2d 396, 398 (9th Cir.1992).

The facts and circumstances surrounding the $10,000 Payment as proved at trial persuade the Court that the $10,000 Payment meets this subjective test. Cocolat and Fisher did not have a long established business relationship. Fisher had performed only one other job for Cocolat, which was finished at about the same time Fisher began its work on the San Francisco Store. However, payment was also made late on that project. Thus, to the extent there was a past practice, the $10,000 Payment was consistent with that practice.

More important, at the inception of the relationship, Cocolat indicated that it would probably not be able to make the payments precisely when due, and Fisher agreed to be flexible. There was no evidence presented that Fisher knew that Cocolat was in financial trouble or took advantage of that knowledge. Alfaro testified that he believed the delay in payment to be due to Titterington's need to obtain approval for the payment from an investor. No evidence was presented to contradict or impeach that testimony.

■ A question remains as to whether Alfaro's reference to Fisher's intention to record a mechanics' lien if payment were not made within an acceptable time frame constituted an "unusual collection practice." The Court is persuaded that it did not. Titterington testified that she was not surprised or influenced by the reference. She testified that one was always aware of a contractor's mechanics' lien rights during negotiations of this sort.

■ The Court is also persuaded that the $10,000 Payment satisfies the objective test—i.e., that it was made in accordance with ordinary business terms. 11 U.S.C. § 547(c)(2)(C). To prove this element, the defendant must submit evidence that the challenged transfer was consistent with "practices common to businesses similarly situated to the debtor and the transferee." This is particularly important where the "record of prior conduct of the debtor and transferee is so random and haphazard that it yields no reasonable, ascertainable boundaries." *Loretto Winery,* 107 B.R. at 709–10.

■ This test may be satisfied as long as the payment was made within "the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage ... only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary...." *In re Molded Acoustical Prods., Inc.,* 18 F.3d 217, 220, 224 (3d Cir. 1994), citing *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993).

The witnesses testified, based on their knowledge of the industry and their experience at and with other firms, that it was customary for mechanics' liens to be recorded if payments were not made on a timely basis and for negotiations to be conducted in light of this practice. No evidence was presented to contradict this testimony.

Courts have generally recognized that creditors may exert some degree of collection pressure without rendering a resulting payment outside the ordinary course of business. *See In re Rave Communications, Inc.,* 128 B.R. 369, 373 (Bankr.S.D.N.Y.1991) (holding that tacit threat not to deliver more goods unless balance paid did not destroy ordinary course nature of payment where creditor had no reason to believe debtor was insolvent) and *In re Kahn & Associates, Inc.,* 135 B.R. 251, 254 (Bankr.W.D.Pa.1991) (holding that payment was in ordinary course despite modification of past practices to require past balances to be paid before further credit extended). To the extent that Fisher's reference to its mechanics' lien rights constituted collection pressure, the Court concludes that it did not exceed the bounds of ordinary business practice.

■ The Court further notes that recording a mechanics' lien is not considered an act to enforce the contractor's claim, merely an act to perfect it. For this reason, and because the contractor's right to perfect its lien is a vested pre-petition right, the recordation of the lien is excepted from the bar of the automatic stay. 11 U.S.C. § 362(b)(3). In view of this fact, it would seem incongruous to conclude that the mere mention of the

right to record a lien constituted "unusual collection activity" or was so "idiosyncratic" that the $10,000 Payment should be deemed not made in accordance with ordinary business terms.

## CONCLUSION

The Court is persuaded that the $10,000 Payment was a preference. Fisher failed to establish the right to a defense under 11 U.S.C. § 547(c)(1) or (6). However, Fisher succeeded in establishing a defense under 11 U.S.C. § 547(c)(2). The Court is persuaded that the $10,000 Payment satisfies both the subjective test of 11 U.S.C. § 547(c)(2)(B) and the objective test of 11 U.S.C. § 547(c)(2)(C). As a result, Fisher is entitled to a defense pursuant to 11 U.S.C. § 547(c)(2). The $10,000 Payment may not be avoided. Judgment will be entered in favor of Fisher. Fisher is directed to submit a proposed form of judgment in accordance with this decision.