In the Matter of RDM SPORTS GROUP, INC.; RDM Holdings, Inc.; Sports Group, Inc.; Diversified Products Corporation; Willow Hosiery Company, Inc.; Hutch Sports USA, Inc.; Diversified Trucking Corp.; International Sports and Fitness, Inc.; and T.Q., INC., Debtors.

William G. Hays, Jr., as Chapter 11 Trustee for RDM Holdings, Inc. and Sports Group, Inc., Plaintiff,

v.

DMAC Investments, Inc., Defendant.

Bankruptcy Nos. 97–12788–WHD to 97–12796–WHD, Adversary No. 99–1063.

United States Bankruptcy Court, N.D. Georgia, Newnan Division.

July 7, 2000.

---

806

James C. Cifelli, Lamberth, Bonapfel, Cifelli & Stokes, P.A., Atlanta, GA, for Plaintiff.

Joseph J. Burton, Jr., Burton & Anderson, Atlanta, GA, for Defendant.

## ORDER

W. HOMER DRAKE, Bankruptcy Judge.

Before the Court are cross motions for summary judgment filed by William G. Hays, Jr. (hereinafter the "Trustee") and DMAC Investments, Inc. (hereinafter "DMAC"). The cross motions arise in an adversary proceeding initiated by the Trustee in accordance with 11 U.S.C. §§ 547 and 548 to recover an alleged preferential or fraudulent transfer made by one of the Debtors to DMAC. This matter constitutes a core proceeding within the Court's subject matter jurisdiction, see 28 U.S.C. § 157(b)(2)(F) and (H), and it shall

be disposed of in accordance with the reasoning which follows.

### FINDINGS OF FACT

The relevant facts in this case are undisputed. Roadmaster Corporation (hereinafter "Roadmaster"), now known as RDM Holdings, Inc., one of the Debtors in the main bankruptcy case, executed an industrial building lease on September 1, 1993, with DMAC as the lessor. Rent in the amount of $22,916.67 was due on the first day of each month, and the term of the lease was five years. (Hays' Affidavit, Ex. B at ¶ 1 and 3). The manufacturing facility which was the subject of the lease is located in Tyler, Texas.

On October 27, 1996, Roadmaster sold and assigned its interest in the lease to DP Fitness, Inc. (Hays' Supplemental Affidavit, Ex. E at ¶ 4). As part of the sale and assignment, DP Fitness assumed Roadmaster's liabilities, including its lease obligations to DMAC. (Id., Ex. F at ¶ 1.2). Records maintained by the Alabama Secretary of State reflect that DP Fitness changed its name to Sports Group, Inc. (hereinafter "Sports Group") on December 19, 1996. (Id., Ex. G).

Beginning in February of 1997, Sports Group failed to make rent payments to DMAC. (McInnis Affidavit at ¶ 5). On April 18, 1997, DMAC filed an "Application for Issuance of Distress Warrant" against Roadmaster in the Justice Court, Precinct No. 4, Smith County, Texas. (Id., Ex. B). A distress warrant[1] was issued by the Justice Court on the same day. (Id.). Shortly thereafter, on May 19, 1997, the District Court, 241st Judicial District, Smith County, Texas, entered a default judgment against Roadmaster in the principal amount of $699,833,40. (Id., Ex. C).

DMAC and Roadmaster executed a settlement agreement on June 18, 1997. Reference to the Texas state court lawsuit and the default judgment is made on the first page of the settlement agreement. (Hays'

Affidavit, Ex. D at p. 1). Paragraph one of the agreement provides that "Roadmaster shall pay DMAC Three Hundred Twenty–Five Thousand Dollars ($325,000) in full satisfaction of all amounts due and remaining due under the Lease, including rent, additional rent, taxes, charges, repair, maintenance, damages, other obligations and legal fees, but excluding those other obligations specifically provided for in this Agreement." (Id. at ¶ 1). In addition, paragraph two states that "[u]pon payment and collection of the [$325,000], and the delivery of the letter of credit as hereinafter provided, DMAC shall execute a release ..., and a release in satisfaction of the Judgment in the Case." (Id. at ¶ 2).

Despite the fact that the parties had resolved their differences, DMAC was authorized, until such time as it received payment, to take the necessary steps to collect its judgment. (Id.). To that end, on June 19, 1997, DMAC caused an abstract of its judgment to be filed in the Smith County, Texas property records. (McInnis Affidavit, Ex. E). A writ of execution was issued on June 19, 1997 by the Clerk of the District Court, 241st Judicial District, Smith County, Texas. (Id., Ex. F). A Smith County deputy sheriff levied on Roadmaster's personal property on June 23, 1997, and a public sale of the property was scheduled for July 3, 1997. (Id., Ex. G).

The public sale never took place, as DP Fitness paid $325,000 to DMAC on June 26, 1997. (Hays' Affidavit, Ex. A). DMAC immediately negotiated the check and it was honored on June 27, 1997.(Id.).

RDM Holdings and Sports Group filed Chapter 11 petitions on August 29, 1997. On May 18, 1999, the Trustee filed a complaint against DMAC to recover the $325,000 as either a fraudulent conveyance or a preferential transfer. With respect to said complaint, both parties contend that

---

1. A distress warrant is "a writ allowing an officer to seize a tenant's goods for failing to

pay rent due to the landlord." BLACK'S LAW DICTIONARY 1579 (7th ed.1999).

they are entitled to a judgment as a matter of law.

### CONCLUSIONS OF LAW

#### I. The Summary Judgment Standard

In accordance with Rule 56 of the Federal Rules of Civil Procedure (applicable to bankruptcy pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure), the Court will grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Material facts" are those which might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, a dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Lastly, the moving party has the burden of establishing the right of summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir.1982).

In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985). It remains the burden of the moving party to establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* Fed.R.Civ.P. 56(e). Once the movant has made a *prima facie* showing of its right to judgment as a matter of law, the nonmoving party must go beyond the pleadings and demonstrate that there is a material issue of fact which precludes summary judgment. *Celotex*,

477 U.S. at 324, 106 S.Ct. 2548; *Martin v. Commercial Union Ins. Co.*, 935 F.2d 235, 238 (11th Cir.1991). In the case sub judice, the Court will examine the record to determine whether the cross motions provide a sufficient legal basis which would entitle either party to a judgment as a matter of law. *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir.1988); *Kelly v. United States*, 924 F.2d 355, 358 (1st Cir.1991).

#### II. The Trustee's Fraudulent Conveyance Claim

11 U.S.C. § 548(a)(1)(B)(i) [2] authorizes a bankruptcy trustee to "avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1)(B)(i). At the time the Trustee filed his motion for summary judgment, he did not know that Sports Group had assumed Roadmaster's obligations under the DMAC lease. He reasoned that Sports Group's payment of Roadmaster's debt constituted an exchange for which Sports Group received "less than a reasonably equivalent value." Documentation evidencing Sports Group's legal assumption of Roadmaster's liabilities has now been made part of the record. (*See* Hays' Supplemental Affidavit). Inasmuch as Sports Group changed its name to DP Fitness, there is nothing fraudulent about DP Fitness' payment of $325,000 to DMAC. DMAC is therefore entitled to summary judgment as to the fraudulent conveyance count (count two) of the Trustee's complaint.[3]

---

**2.** Hereafter, unless otherwise noted, all textual statutory references are references to Title 11 of the United States Code.

**3.** For ease of reference, from this point forward, the Court will refer to the various debtor entities collectively as "Roadmaster."

### III. The Trustee's Preference Claim

■ One of the fundamental tenets of the law of bankruptcy is the equality of distribution of a debtor's usually limited assets. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138 (noting the "prime bankruptcy policy of equality of distribution among creditors"). In furtherance of that policy, § 547 authorizes the postpetition recovery of a debtor's prepetition transfers that are deemed to be preferential in nature. In essence, the central purpose of § 547 is to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy." *Id.* The elements of a preference are set forth in § 547(b), which provision permits a trustee to avoid any prepetition transfer of an interest of a debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The burden of proving each of the above elements falls on the Trustee. *See* 11 U.S.C. § 547(g).

■ In the present controversy, three of the five preference components are not in dispute. First, DMAC does not dispute that it was a "creditor," as that term is defined in the Bankruptcy Code.[4] Second, for the purposes of § 547(b)(3), a debtor is presumed to be insolvent during the preference period. *See* 11 U.S.C. § 547(f). DMAC has not provided any evidence that the Debtors were solvent on the transfer date.[5] Third, as for the requirement in subsection (b)(4) that the transfer occur "on or within 90 days before the date of the filing of the petition," DMAC received the check on June 26, 1997, sixty-four (64) days before the petition was filed. Thus, the transfer in questions falls within the preference period.

### A. Whether DMAC had an Antecedent Debt

DMAC contends that the $325,000 payment was not made "on account of an antecedent debt." *See* 11 U.S.C. § 547(b)(2). Before the Court addresses DMAC's specific contentions in this regard, it is important to note that there is no question but that Roadmaster was indebted to DMAC on June 26, 1997, else $325,000 would not have changed hands on that date. Thus, the requirement of a "debt" has been established. That said, the focus of the present inquiry is limited to the term "antecedent."

■ "A debt is 'antecedent' if it was incurred before the allegedly preferential transfer." *Jones Truck Lines, Inc. v. Cent. States, Southeast and Southwest Areas Pension Fund (In re Jones Truck*

---

4. "Creditor" is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A).

5. The presumption stands subject to rebuttal, and a preference defendant may defeat it with contradictory evidence of a debtor's solvency. *See In re Taxman Clothing Co.,* 905 F.2d 166, 168 (7th Cir.1990); *Loeb v. G.A. Gertmenian & Sons (In re A.J. Nichols, Ltd.),* 21 B.R. 612, 616 (Bankr.N.D.Ga.1982) (Drake, J.).

*Lines, Inc.)*, 130 F.3d 323, 329 (8th Cir. 1997). Furthermore, a debt is incurred "on the date upon which the debtor first becomes legally bound to pay." *Bernstein v. RJL Leasing (In re White River Corp.)*, 799 F.2d 631, 632 (10th Cir.1986); *Iowa Premium Serv. Co. v. First Nat'l Bank in St. Louis, St. Louis Missouri (In re Iowa Premium Service Co.)*, 695 F.2d 1109, 1111 (8th Cir.1982) (en banc). With these basic principles in mind, the Court feels compelled to determine when Roadmaster became legally obligated to pay DMAC.

■ On September 1, 1993, the parties executed a lease. Monthly rental payments were due thereunder on the first day of each month. Roadmaster ceased making contractual lease payments in early 1997. The Court is of the view that Roadmaster incurred a legal obligation to DMAC each month that it failed to pay rent. *See White River Corp.*, 799 F.2d at 633 (concluding that a debt is incurred pursuant to a lease in monthly increments on the actual dates rent becomes due); *Durant's Rental Ctr., Inc. v. United Truck Leasing, Inc. (In re Durant's Rental Center, Inc.)*, 116 B.R. 362, 366 (Bankr. D.Conn.1990) (same); *Sapir v. Eli Haddad Corp. (In re Coco)*, 67 B.R. 365, 370 (Bankr.S.D.N.Y.1986) (same) (citations omitted). In addition to its independent obligation to pay monthly rent, Roadmaster became a judgment debtor on May 19, 1997. By definition, a judgment is "[a] court's final determination of the rights and obligations of the parties in a case." BLACK'S LAW DICTIONARY 846 (7th ed.1999). In a statement of the obvious, the Ninth Circuit has remarked that "a judgment debtor is under a legal obligation to satisfy the judgment against him." *United States v. Neidorf*, 522 F.2d 916, 920 n. 5 (9th Cir.1975). Based on the evidence in this case, Roadmaster first became legally obligated to DMAC in February of 1997, with such obligation continuing thereafter until payment was made on June 26, 1997.

■ Despite Roadmaster's breach of the lease and the judgment which came about as a consequence thereof, DMAC advances three reasons why its debt was not "antecedent" to the transfer.[6] DMAC first claims that the transfer was not made on account of an antecedent debt because it was made in partial performance of an executory contract. Stated differently, DMAC would have the Court believe that Roadmaster paid the $325,000 in order to "buy out the remainder of the lease term." [7] (DMAC's Brief in Support of Summary Judgment at p. 12). According to the settlement agreement, Roadmaster made the payment "in full satisfaction of **all amounts due and remaining due under the lease.**" (Hays' Affidavit, Ex. D at ¶ 1) (emphasis supplied). The phrase "and remaining due under the lease" lends some credence to DMAC's argument. That language notwithstanding, given the existence of the judgment and the fact that a sheriff's sale was imminent, it is hard for the Court to believe that Roadmaster made the payment in satisfaction of future lease obligations. Even if the parties intended to allocate the payment to Roadmaster's future indebtedness, the fact that the debt "would have extended into the future but for the settlement agreement does not change the antecedent nature of the debt." *Upstairs Gallery, Inc. v. Macklowe W. Dev. Co, L.P. (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 918 (9th Cir. BAP 1994); *see also Durant's Rental Ctr.*, 116 B.R. at 366 (rejecting argument that payments made by the debtor in exchange for a release of its current and existing lease obligations not made on account of an antecedent debt).

DMAC next argues that the transfer was not made on account of an antecedent

---

6. As will be discussed below, DMAC advances similar reasons why the transfer should be declared a contemporaneous exchange for new value.

7. More than twelve months remained on the lease term at the time the parties signed the settlement agreement.

debt because it was made in exchange for a release of its judgment lien. The fallacy in this argument is that the record does not reflect that DMAC ever released its lien. In fact, DMAC represents on page ten of its brief that

> Roadmaster did not provide the required letter of credit, did not empty the Leased Premises and did not leave the Premises in broom clean condition. Because Roadmaster had not yet complied with the conditions which triggered DMAC's promise to release the lien, Roadmaster [sic] had not released the lien on the date the bankruptcy petition was filed. Thus, DMAC's judgment lien remained valid when the petition was filed.[8]

(DMAC's Brief in Support of Summary Judgment at p. 10). DMAC's admission undermines its argument. Simply put, it cannot be said that Roadmaster paid $325,000 for a lien release.

DMAC's final argument on this issue is that there can be no transfer on account of an antecedent debt if the transfer was made in settlement of litigation. In support of this argument, DMAC directs the Court's attention to the Third Circuit's decision in *Lewis v. Diethorn*, 893 F.2d 648 (3rd Cir.1990), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). In *Lewis*, the Third Circuit was confronted with a dispute over the construction of a residence. 893 F.2d at 649. The preference defendants (the future homeowners) sued the debtor (the contractor) in Pennsylvania state court some nine months prior to the bankruptcy filing, and they recorded a lis pendens on the property. *Id.* Apparently, before the matter was tried or a judgment entered, the parties settled their differences. *Id.* During the preference period, the debtor paid the defendants $15,500 in return for a dismissal of

the complaint and the cancellation of the lis pendens. *Id.* The Third Circuit held that the payment in question was not on account of an antecedent debt. Specifically, the court concluded that

> [The debtor] paid the $15,500 to the [defendants] in exchange for their undertaking to terminate the lawsuit in Pennsylvania court and so to remove the lis pendens from the property index. What [the debtor] received was not the freedom from liability on an antecedent debt, but the freedom from the risk of litigation, together with the rise in the value of the property which resulted when the lis pendens was lifted.

*Id.* at 650.

In several respects, *Lewis* is factually distinguishable from the present case. For example, the preference defendants in *Lewis* had not established the debtor's liability at the time of the transfer. In the present case, a judgment (with no apparent appeal taken) preceded the payment in question. The preference defendants in *Lewis* actually dismissed their lawsuit and canceled the lis pendens. As previously noted, DMAC never released its judgment lien. Another critical factual distinction is that in *Lewis*, the preference defendants filed a lis pendens nine months before the bankruptcy filing. Here, DMAC perfected its judgment lien during the preference period.[9]

The factual differences aside, *Lewis* is not binding authority in this circuit, and the Court declines to follow it. The bottom line is that Roadmaster incurred a legal obligation to DMAC long before the parties reached a settlement. *See Upstairs Gallery*, 167 B.R. at 918 ("A later compromise of the claim does not affect the time when the debt first arose.") (citation omitted). Because the Court is at

---

8. DMAC also notes on page five of its brief that the Trustee has not sought to avoid its judicial lien. (DMAC's Brief in Support of Summary Judgment at p. 5).

9. The timing of DMAC's lien perfection implicates the hypothetical Chapter 7 test set forth in § 547(b)(5). The Court will soon address § 547(b)(5)'s impact on this case. Section 547(b)(5), however, was not at issue in *Lewis*.

a loss to explain how the settlement did or could destroy the antecedent quality of the underlying debt, it must reject DMAC's contention that there can be no transfer on account of an antecedent debt if the transfer was made in settlement of litigation. *See New York Credit Adjustment Bureau, Inc. v. Just In–Materials Designs, Ltd. (In re Vasu Fabrics, Inc.)*, 39 B.R. 513, 515–17 (Bankr.S.D.N.Y.1984) (payment made to creditor pursuant to settlement agreement was on account of an antecedent debt); *see also Upstairs Gallery*, 167 B.R. at 919 (concluding that simply because the parties settled, the payment made in connection with the settlement did not create a new debt for purposes of § 547(b)(2)).

It is the Court's opinion that Roadmaster's payment was made on account of an antecedent debt. Such conclusion is supported by the weight of authority and common sense. Accordingly, the Trustee has satisfied his burden of proof as to § 547(b)(2).

*B. Whether DMAC Received More than it Would Have Received in a Hypothetical Chapter 7 Liquidation*

■ By its terms, § 547(b)(5) requires the Trustee to demonstrate that DMAC received more money during the preference period than it would have received if (1) the transfer had not been made, (2) the case were a Chapter 7 proceeding, and (3) it received payment on its claims as provided for in the Bankruptcy Code. *Comm. of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.)*, 59 F.3d 969, 972 (9th Cir. 1995). In essence, the Court must compare what DMAC received during the preference period with what it would have received if the case had been administered under Chapter 7 of the Bankruptcy Code. 5 COLLIER ON BANKRUPTCY ¶ 547.03[7] at

547–39 (15th rev. ed.1999). As a matter of general principle, unless creditors will receive a 100 percent distribution, "any unsecured creditor who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation." *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465 (6th Cir.1991) (citation omitted); *Flatau v. Tribble's Shoes, Inc. (Matter of Lawrence)*, 82 B.R. 157, 160 (Bankr. M.D.Ga.1988) (same) (citation omitted). In an affidavit filed in support of his summary judgment motion, the Trustee has opined that "[e]ven assuming a 'best case scenario' with regard to liquidation of assets and recoveries on claims, I see no reasonable prospect for a 100 percent distribution to unsecured creditors in this bankruptcy case." [10] (Hays' Affidavit at ¶ 14).

■ Crucial to this inquiry is the distinction between a secured and unsecured creditor. "Section 547(b)(5) is premised upon the Bankruptcy Code's acknowledgment that a valid security interest survives a liquidating bankruptcy, and to the extent that a creditor is fully secured, payment to that creditor in satisfaction of the security interest is not a preferential transfer." *Emerson v. Fed. Sav. Bank (In re Brown)*, 209 B.R. 874, 885 (Bankr.W.D.Tenn.1997); *see also Powerine Oil Co.*, 59 F.3d at 972; *Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 554 (10th Cir.1993) (citation omitted); *Ray v. City Bank and Trust Co. (In re C–L Cartage Co.)*, 899 F.2d 1490, 1493 (6th Cir.1990); *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1034 (5th Cir.1987). DMAC claims that by virtue of its judgment lien, it was a secured creditor during the pref-

---

**10.** Unsecured creditors are owed approximately $130 million in this Chapter 11 proceeding. On at least one occasion, the Court has noted the administrative insolvency of these estates. (*See* Confirmation Order, December 10, 1999 at p. 5). Based on evidence presented as part of the confirmation process, the Court shares the Trustee's sentiment that unsecured creditors are unlikely to be paid in full.

erence period.[11] Further, DMAC reasons that its status as a secured creditor protects it from preference attack.

Section 547(b)(5) provides that a trustee can set aside a transfer that enables a creditor to receive more than the creditor would receive if (i) "the case were a case under chapter 7 of this title"; (ii) "the transfer had not been made"; and (iii) "such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b)(5). Use of the word "if" in the statute means that the Court must determine how the transfer could have been treated in a Chapter 7 liquidation. *See Hoffman v. Cent. Pennsylvania Nat'l Bank (In re Hoffman)*, 96 B.R. 46, 48 (Bankr.W.D.Pa. 1988) (trustee could have avoided the transfer under § 547 to the extent creditor received more than it would have in a chapter 7 proceeding). Indeed, the general rule stated above that payment to a fully secured creditor is not preferential "has no application if the creditor's claim of fully secured status is built on a security interest or lien in collateral that **is avoided or could have been avoided.**" 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 6–20, at 582 n. 20 (1992) (emphasis supplied). Thus, whether DMAC's judgment lien could have been avoided is the proper focus of the hypothetical Chapter 7 liquidation test.

Provided that all of the elements of a preference are satisfied, the fixing of a judicial lien is itself a transfer subject to avoidance. *Cullen Ctr. Bank & Trust v. Hensley (Matter of Criswell)*, 102 F.3d 1411, 1415 (5th Cir.1997); *In re Jim–O–Lette, Inc.*, 140 B.R. 874 (Bankr. N.D.Tex.1992); *Carlson v. Rose (In re Rose)*, 86 B.R. 193, 194 n. 1 (Bankr. W.D.Mo.1988); *Lewis v. Custom Heating*

*Co. (In re Joseph M. Eaton Builders, Inc.)*, 84 B.R. 56, 58 n. 1 (Bankr.W.D.Pa. 1988). It has already been established that as of June 23, 1997, the day of the sheriff's levy and the establishment of its lien, DMAC was a creditor with an antecedent debt. Insolvency is presumed during the preference period. The creation of DMAC's judicial lien preceded the bankruptcy petition by sixty-seven (67) days. The first four elements of a preference are thus satisfied.

Before DMAC procured its lien, it was an unsecured creditor with a rent claim against Roadmaster.[12] By obtaining a judgment lien enforceable against Roadmaster's personal property, DMAC elevated its status as an unsecured creditor to that of a secured creditor. As a creditor capable of forcing the liquidation of Roadmaster's property in an effort to satisfy its claim, DMAC enhanced its position vis-à-vis other unsecured creditors. Put differently, the judgment lien permitted DMAC to receive more than it would have received as an unsecured creditor in a hypothetical Chapter 7 proceeding. *See Deel Rent–A–Car, Inc. v. Levine*, 16 B.R. 873, 875 (S.D.Fla.1982) (creditor's perfection of its judgment lien [by recording it] during preference period changed its status from an unsecured creditor to that of a secured creditor; therefore, creditor would be entitled to a greater percentage of its claim under a Chapter 7 liquidation than if it had not perfected its lien), *aff'd*, 721 F.2d 750, 755 (11th Cir.1983) ("section 547 of the Code would normally prevent a race to the courthouse by giving the trustee the power to avoid any judicial lien [however valid under state law] during the preference period"); *Babiker v. Citizens Contracting Co. (In re Babiker)*, 180 B.R. 458, 460

---

11. Both parties have acknowledged that Texas law governs disputes concerning the Roadmaster/DMAC lease. In Texas, "[a] valid levy of an execution creates a lien on the debtor's property in favor of the judgment creditor." *Texas Employers' Ins. Assoc. v. Engelke*, 790 S.W.2d 93, 95 (Tex.App.1990, no writ) (citation omitted) (Duggan, J., dissenting). It does not appear that the Trustee disputes the validity of the levy or DMAC's lien.

12. Even if DMAC had a landlord's lien pursuant to § 54.021 of the Texas Property Code, a statutory lien for rent is avoidable in bankruptcy under § 545(3) and (4).

(Bankr.E.D.Va.1995) (same); *Rose*, 86 B.R. at 194 n. 1 (same). With respect to DMAC's judicial lien, all of the elements of a preference are present. Had these cases been filed under Chapter 7 of the Bankruptcy Code, a trustee could have avoided DMAC's lien. Consequently, Roadmaster's payment to DMAC in satisfaction of the judgment constitutes an avoidable preference. *Joseph M. Eaton Builders, Inc.*, 84 B.R. at 58 n. 1 ("Because the judgment lien itself was obtained within the 90–day preference period, it is subject to the Trustee's avoiding powers, as is the payment itself which was based upon that judgment."); *Rubin Bros. Footwear, Inc. v. Chemical Bank (In re Rubin Bros. Footwear, Inc.)*, 73 B.R. 346, 355 (S.D.N.Y. 1987) (concluding that if the actual transaction which creates the creditor's security interest is an avoidable preference, "it follows that all the subsequent payments were also voidable preferences").

Since the administration of these estates will likely generate only a small return to unsecured creditors, the $325,000 transfer enabled DMAC to receive a greater return than if the transfer had not been made and if these estates had been liquidated under Chapter 7. The Trustee has successfully established the fifth element of a preference, and he has carried his burden of proving that the transfer to DMAC satisfies all of the requirements of § 547(b).

### IV. DMAC's New Value Defense

■ A transfer which technically qualifies as a preference may nonetheless be shielded from avoidance if the creditor provides "new value" to the debtor. Section 547(c)(1)(A) provides that a trustee cannot avoid a transfer "to the extent that such transfer was intended by the debtor and the creditor ... to be a contemporaneous exchange for new value given to the debtor." 11 U.S.C. § 547(c)(1)(A). According to the Bankruptcy Code,

"new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.[13]

11 U.S.C. § 547(a)(2). In applying this definition of new value, the Eleventh Circuit has recognized that

courts have consistently looked to the principal policy objectives underlying the preference provisions of the Bankruptcy Code. The first objective is to encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse. Another related objective of this section is to promote equality of treatment among creditors. The subsequent advance exception promotes these general policy objectives "because its utility is limited to the extent to which the estate was enhanced by the creditor's subsequent advances during the preference period."

*Charisma Inv. Co., N.V. v. Airport Sys., Inc. (In re Jet Florida Sys., Inc.)*, 841 F.2d 1082, 1083–84 (11th Cir.1988) (internal citations omitted). Phrased differently, the theory behind the new value exception is that a creditor who truly gives new value in exchange for a preferential transfer has not depleted the debtor's estate to the detriment of other creditors. 1 David G. Epstein et al., Bankruptcy § 6–25, at 592 (1992).

■ DMAC contends that it gave new value to Roadmaster in the form of three distinct acts. First, DMAC insists that it gave new value by releasing its lien. *See Kenan v. Fort Worth Pipe Co. (In re George Rodman, Inc.)*, 792 F.2d 125 (10th Cir.1986); *Cocolat, Inc. v. Fisher Dev.,*

---

**13.** The definition of "new value" was intended by Congress to be exclusive, else it would have substituted "new value includes" for the phrase "new value means." *Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.)*, 832 F.2d 997, 1003 (7th Cir.1987).

*Inc. (In re Cocolat, Inc.),* 176 B.R. 540, 547 (Bankr.N.D.Cal.1995) ("the release of a lien that has already been recorded on the debtor's property clearly qualifies as 'new value' "). The Court has already observed that the record is devoid of any evidence that DMAC effectuated a lien release. Therefore, *Rodman* and *Cocolat* cases are inapposite, and no further discussion on this point is necessary.

■■■■ DMAC also claims that it extended new value by canceling the sheriff's sale and by waiving Roadmaster's future performance under the lease. As for calling off the sheriff's sale, DMAC's act is best described as debt collection forbearance. The term "forbearance" is defined as "[t]he act of refraining from enforcing a right, obligation, or debt." BLACK'S LAW DICTIONARY 656 (7th ed.1999). Eleventh Circuit precedent provides that "[f]orbearance from exercising pre-existing rights does not constitute new value." *Am. Bank of Martin County v. Leasing Serv. Corp. (In re Air Conditioning Inc. of Stuart),* 845 F.2d 293, 298 (11th Cir.1988) (citations omitted), *cert. denied,* 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *see also Wolinsky v. Cent. Vermont Teachers Credit Union (In re Ford),* 98 B.R. 669, 683–84 (Bankr.D.Vt.1989) ("forbearance, whether consensual/nonconsensual, direct/indirect, unilateral/bilateral, or intentional/unintentional, may not constitute new value"); *cf. Bavely v. Merchants Nat'l Bank (Matter of Lario),* 36 B.R. 582, 584 (Bankr. S.D.Ohio 1983) (lessor's forbearance from exercising rights under lease does not constitute new value since forbearance does not enhance value of the debtor's estate). Similarly, this Court agrees with the Seventh Circuit that releasing a debtor from its contractual obligations does not fall within § 547(a)(2)'s definition of new value and is not the equivalent of new value. *In re Energy Coop., Inc.,* 832 F.2d at 1003; *Durant's Rental Ctr., Inc. v. United Truck Leasing, Inc. (In re Durant's Rental Ctr., Inc.),* 116 B.R. 362 (Bankr.D.Conn.1990) (same) (citation omitted).

■■■ In closing, the Court notes that in return for $325,000, DMAC certainly did not extend traditional credit or provide goods to Roadmaster. Moreover, the Court is not persuaded that DMAC's so-called new value in the form of acts actually enhanced the value of these estates. Therefore, the Court concludes that Roadmaster's transfer to DMAC was not intended by the parties "to be a contemporaneous exchange for new value."

CONCLUSION

Having given this matter its careful consideration, the Court concludes that no material questions of fact remain outstanding in this proceeding and that the Trustee is entitled to summary judgment on his preference count (count one). DMAC is entitled to summary judgment as to the fraudulent conveyance count (count two) of the Trustee's complaint. Accordingly, based on the reasoning contained herein, the Trustee's Motion for Summary Judgment is hereby **GRANTED IN PART** and **DENIED IN PART.** Likewise, DMAC's Motion for Summary Judgment is hereby **GRANTED IN PART** and **DENIED IN PART.** Judgments consistent with this opinion shall enter.

**IT IS SO ORDERED.**