In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3127

YVETTE GAFF KLEVEN, Trustee,
MARK A. WARSCO, Trustee,
DAVID R. DUBOIS, Trustee,

*Plaintiffs-Appellants*,

*v.*

HOUSEHOLD BANK F.S.B.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:02CV26—**William C. Lee**, *Judge*.

ARGUED JANUARY 24, 2003—DECIDED JUNE 30, 2003

Before RIPPLE, EVANS, and WILLIAMS, *Circuit Judges*.

EVANS, *Circuit Judge*. Today, some people can buy a luxury automobile, say a Lexus or a Cadillac, and pay it off with an interest-free loan. The signs are everywhere: "Zero % financing." People in the market for luxury cars, however, are not in the market for Refund Anticipation Loans (RALs), the subject of the appeal in this case. RALs attract millions of people who are short on cash—those who either can't wait, or choose not to wait, for the Internal Revenue Service to process their income tax returns and send them a refund check through the mail. These people want their money now, and to get it they use a tax

preparer like H & R Block and strike a bargain with a bank like Household, the defendant here. The bargain struck is a good one for only one of the two parties. Guess which one?

We start with a little background on RALs and some statistics from Milwaukee, a fairly typical American city. According to the national research, over half of all U.S. tax filers use commercial tax preparers, but the marketing of RALs is aimed mainly at low income families eligible for the earned income tax credit (EITC). Most of these people are without personal bank accounts in which to receive a direct deposit tax refund. A recent report, prepared by the University of Wisconsin-Milwaukee Employment and Training Institute in cooperation with The Brookings Institution, reviews the use of RALs by ZIP Code areas in central city Milwaukee neighborhoods. The report used the tax year 2000 and data obtained by Brookings staff from the Internal Revenue Service. Nine central city Milwaukee ZIP Codes in the heart of Milwaukee's Community Development Block Grant (CDBG) neighborhoods—the poorest neighborhoods—were analyzed, as well as other more affluent areas of the city and its suburbs. The study disclosed that in Milwaukee County, 29,458 tax filers claiming the federal earned income tax credit used tax preparers and borrowed against their refunds through RALs prior to receiving them from the IRS. The lion's share of these filers lived in Milwaukee's distressed CDBG neighborhoods.

The Brookings study found that national tax preparation chains typically charge around $100 for preparing and filing a simple tax return and an additional $75 to $100 fee for a RAL. At these rates, the study concludes, lower-income Milwaukee filers who used commercial tax preparers and RALs lost $5.5 million in tax refunds and federal EITC payments in 2000.

In a fairly routine case, a tax return filer like those identified in the study pays a fee for preparation of the return—say $100. The return discloses a refund due most likely from the EITC of, say, $600. After paying the tax preparer's fee, the filer has a choice: wait for an IRS check for $600 or enter into a RAL for a fee, usually around $75. Because walking out with $525 (or $425 if the tax preparation charge is rolled into the deal) apparently seems like a better option than waiting for $600, the bargain is struck. And unlike the Lexus buyer paying zero percent annual interest, the filer pays what amounts to an exorbitant interest rate—often over 100 percent—when computed on an annual percentage basis. For more on the study we have referred to see Alan Berube, Anne Kim, Benjamin Forman and Megan Burns, *The Price of Paying Taxes: How Tax Preparation and Refund Loan Fees Erode the Benefits of the EITC* (The Brookings Institution and the Progressive Policy Institute, May 2002); Anne Kim and Alan Berube, "Fast Cash for the Tax Man," *Blueprint Magazine*, May 21, 2002; and "Use of Refund Anticipation Loans by Earned Income Tax Credit Filers in Central City Milwaukee Neighborhoods," a study by Lois M. Quinn, Employment and Training Institute, School of Continuing Education, University of Wisconsin-Milwaukee, June 2002.

As we see it, an attack on RALs based on fairness and equity would certainly have some appeal. But the appeal we consider today attacks RALs from a different angle. In our case, over 100 adversary proceedings were consolidated in the bankruptcy court, and all of them present the same question: What happens when a tax filer enters bankruptcy proceedings within 90 days of signing off on a RAL? The plaintiffs are trustees in chapter 7 cases seeking to recover the tax refund payments received by Household Bank. The trustees want to get their hands on the funds under two theories, arguing that the funds are

impermissible setoffs or avoidable preferences under §§ 553 and 547 of the Bankruptcy Code.

The transactions in question proceeded in the following manner. During the 90-day period before filing for bankruptcy, the debtor applied for a RAL from Household by filling out a form entitled "Loan Application, Authorization and Certification for a Refund Anticipation Loan." The debtor also established a bank account at Household for the sole purpose of electronically receiving a federal income tax refund. In addition, the debtor completed a Form 8453 consenting to have the IRS deposit his tax refund directly into the account with Household and, with the bank's helping hand, he designated a routing number and bank account number corresponding to that account on his return. At or about the same time, the debtor was provided with two additional items—a disclosure document and a summary sheet.

The bankruptcy court rejected the trustees' pleas, concluding that the transactions resulted in money in the bank's pocket that was more appropriately considered a recoupment and that the bank came upon the funds in the ordinary course of business. *Warsco v. Household Bank F.S.B.*, 272 B.R. 246 (Bankr. N.D. Ind. 2002). The district court agreed with this determination when it rejected the trustees' appeal. We begin with a closer look at the mechanics of a RAL.

It is undisputed that the bank retained exclusive control over the RAL accounts and that no funds other than the tax refund were deposited into them. And the bank's exclusive control, of course, meant that the debtors could not get their hands on the funds once they reached the designated account. The undisputed facts also provide the following information about each individual RAL transaction: (1) the name and social security number of the debtor, (2) the loan application date, (3) the loan

amount, (4) the date the loan check was issued, (5) the date the electronic fund transfer from the IRS was received into the debtor's account at the bank, and (6) the date the bank took control of the deposit. The parties have also stipulated, in each case, as to the date the bankruptcy petition was filed and the prior years, if any, when the debtor participated in the bank's RAL program. As to this point, it is noteworthy that only 15 of the more than 100 debtors in our case were first-time parties to RALs with Household. Lastly, the parties agree that all of the transfers were made in accordance with the ordinary business practices of parties engaged in the tax refund loan industry.

In responding to the trustees' claims, both below and here, the bank contends that each debtor made an absolute assignment of his tax refund or, alternatively, that it held a perfected security interest in the refund or its proceeds. As an affirmative defense to the preference claims, the bank asserts that the money it received is protected by the ordinary course of business defense under § 547(c)(2). It also characterizes each payment as a recoupment, rather than a setoff, which prevents the trustees from recovering the funds under § 553(b) or § 549(a).

Upon submitting an application, or perhaps a day later, the debtor received a check from Household in the amount of his anticipated federal tax refund, less Household's fee. Sometime thereafter, the IRS deposited the debtor's tax refund into the debtor's designated account at Household. Household then immediately transferred the funds to itself. It is this transfer, by which the bank actually received the money, that the trustees seek to avoid.

Section 547(b) of the Bankruptcy Code allows a trustee to avoid some payments to creditors made during the 90

days prior to bankruptcy. These payments are regarded as "preferential," and thus avoidable, because they allow the favored creditor to receive more than if he had to wait in line with other creditors and share with them what is usually rather slim pickings from the debtor's estate. The purpose of this section is two-fold. It is designed to promote equality of distribution among all creditors while simultaneously it deters creditors from "racing to the courthouse to dismember the debtor during [his] slide into bankruptcy," *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991). *See also In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 847 (7th Cir. 1997).

But not all payments to creditors during the 90 days prior to bankruptcy are avoidable preferential transfers. In crafting § 547, Congress created exceptions protecting certain transfers from a trustee's reach. *See* 11 U.S.C. § 547(c). Among them is the "ordinary course of business" exception. Where a transfer is (a) "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee," (b) "made in the ordinary course of business or financial affairs of the debtor and the transferee," and (c) "made according to ordinary business terms," it is insulated from avoidance. *See* 11 U.S.C. § 547(c)(2)(A)-(C). This exception was designed to "leave undisturbed normal commercial and financial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of both the debtor and the debtor's transferee." *See In re Armstrong*, 231 B.R. 723, 729 (Bankr. E.D. Ark. 1999), *aff'd*, 260 B.R. 454 (E.D. Ark. 2001). These transactions are not considered "preferential," although they would otherwise fit comfortably within the statutory definition. The creditor has the burden of proving that the debtor's payment to it qualifies for this protection. *See* 11 U.S.C. § 547(g).

We have examined the ordinary course of business defense on several occasions. *See*, *e.g.*, *Barber v. Golden Seed Co.*, 129 F.3d 382 (7th Cir. 1997); *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845 (7th Cir. 1997); *In re Midway Airlines, Inc.*, 69 F.3d 792 (7th Cir. 1995); *In re Tolona Pizza Prod. Corp.*, 3 F.3d 1029 (7th Cir. 1993). And we must consider whether the transaction, the RAL here, was "ordinary" not only as between the debtor and the bank, but also in the context of how the RAL industry operates as a whole. *See Midway Airlines*, 69 F.3d at 797. Because it is undisputed that the transactions were "ordinary" within the tax refund loan industry, if they were also ordinary as between Household and the individual debtors, they are not avoidable preferences. In making this determination we consider several factors, including:

(1) the length of time the parties were engaged in the transaction at issue;

(2) whether the amount or form of tender differed from past practices;

(3) whether the debtor or creditor engaged in any unusual collection or payment activity; and

(4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Barber*, 129 F.3d at 390. This is not an exhaustive list of factors. Others, in appropriate considerations, may be a better fit.

In our case, where the debtor was a prior RAL customer of the bank, that history persuades us that the transactions challenged were ordinary as between Household and the debtor because they occurred in the same manner and under the same circumstances as in prior years. Where, however, the challenged transaction was the first RAL between the parties, a closer question is presented.

We have not directly addressed this "first-time" issue but other courts have, with mixed results, although most side with the view that a first-time transaction is not per se ineligible for protection from avoidance under § 547(c)(2). *Compare In re Finn*, 909 F.2d 903 (6th Cir. 1990); *In re Russell Cave Co.*, 259 B.R. 879 (Bankr. E.D. Ky. 2001); *In re Air South Airlines*, 247 B.R. 165 (Bankr. D. S.C. 2000); *In re Armstrong*, 231 B.R. 723 (Bankr. E.D. Ark. 1999), *aff'd*, 260 B.R. 454 (E.D. Ark. 2001); *In re Morren Meat & Poultry Co.*, 92 B.R. 737 (W.D. Mich. 1988) (a first-time transaction can qualify as a payment in the ordinary course of business) *with In re Brown Transp. Truckload, Inc.*, 152 B.R. 690 (Bankr. N.D. Ga. 1992) (a first-time transaction is categorically ineligible for protection as payment in the ordinary course of business).

Although a history of dealing between parties is certainly the strongest factor supporting a determination that the business between a debtor and an alleged preference creditor is ordinary, we do not believe it is absolutely necessary in every case. In some instances, and this is one, the ordinary course of business may be established by the terms of the parties' agreement, until that agreement is somehow or other modified by actual performance. In the absence of modifying behavior, we see no reason why we should not look to the terms of the parties' agreement in order to determine their ordinary course of business. Indeed, as Judge Grant in the bankruptcy court astutely observed here,

> the court can imagine little (short of the certain knowledge that its debt will not be paid) that would discourage a potential creditor from extending credit to a new customer in questionable financial circumstances more than the knowledge that it would not even be able to raise the ordinary course of business defense, if it is subsequently sued to recover an alleged preference.

In our case, every RAL transaction, including the first-time transactions between Household and a particular debtor, was conducted in accordance with the terms of the parties' written agreement. This included the timing and the manner in which Household applied the funds from each debtor's account to the loan balance. We conclude that all of the transactions were ordinary as between the parties. Because each transaction was ordinary as between the parties and when measured against the tax refund loan industry as a whole according to ordinary business terms, they are insulated from avoidance under § 547(c)(2).

In closing, we comment on one final matter. The trustees argue that RALs actually involve two separate transactions. In the first, the debtor applies for a tax refund with the IRS. In the second, the bank makes a loan to the debtor. Viewed this way, the trustees see a setoff. The reality of a RAL process, however, is more accurately viewed as a single integrated transaction. And because Household held title to the funds when they were received at the bank and then transferred to the bank's own account, the bank was not engaging in "setting off" a debt owed by the debtor.

The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*