In re GOLFVIEW DEVELOPMENTAL CENTER, INC., Debtor.

Golfview Developmental Center, Inc., Plaintiff,

v.

All–Tech Decorating Company, Defendant.

Bankruptcy No. 02 B 04549.
Adversary No. 03 A 00657.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 11, 2004.

David J. Fisher, Esq., Holly L. Tomchey, Esq., Wildman, Harrold, Allen & Dixon LLP, Chicago, IL, for Plaintiff.

Robert A. Drobnak, Esq., Lord, Bissell & Brook LLP, Chicago, IL, for Defendant.

## *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the complaint filed by Golfview Developmental Center, Inc. (the "Debtor") to avoid and recover an alleged preferential transfer pursuant to 11 U.S.C. §§ 547 and 550 and Rule 7001 of the Federal Rules of Bankruptcy Procedure made to All–Tech

Decorating Company, Inc. ("All–Tech") in the sum of $100,211.50. For the reasons set forth herein, the Court finds that the pre-petition transfer by the Debtor to All–Tech is not an avoidable preference under § 547(b) and is not recoverable under § 550(a).

## I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

## II. *FACTS AND BACKGROUND*

The Debtor operates a nursing home for developmentally disabled adults located in Des Plaines, Illinois (the "Premises"). It has been licensed by the State of Illinois Department of Public Health as an intermediate care facility for the developmentally disabled; it cares for approximately 135 persons with special needs. Anthony Miner serves as the Debtor's president and administrator, and is in charge of its day to day activities, including hiring, supervising and paying repair persons and contractors.

On February 5, 2002, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the petition date, the Debtor has operated its business pursuant to 11 U.S.C. § 1107. On December 24, 2002, the Court confirmed the Debtor's second amended plan of reorganization.

The leased property where the Debtor operates is owned by another entity closely related to the Debtor, Golfview Realty Partnership, Inc. (the "Partnership" or the "Landlord"). The Partnership has three partners: Anthony Miner, Greg Miner and Bertram Miner. Bertram Miner is Antho-ny Miner's father and Greg Miner is Anthony Miner's brother. Anthony Miner is the sole general partner and managing member of the Partnership; there are no other employees. The Partnership leases the Premises to the Debtor pursuant to a 20 year commercial lease dated January 24, 1996 (the "Lease"). Debtor's Ex. No. 13. According to the Lease terms, the Debtor must pay the Landlord monthly rent in the amount of $91,478.79, and the Debtor is responsible for maintaining the interior of the Premises, including maintaining the condition of the interior paint of the Premises. *Id.*

The Lease is subordinate to the Regulatory Agreement for Multifamily Housing Projects dated February 7, 1996, by and between the Landlord and the United States Department of Housing and Urban Development ("HUD" and the "HUD Agreement"). *Id.;* Debtor's Ex. No. 15. At all times relevant to this case, the Debtor was required to comply with the terms of the HUD Agreement and was not permitted to do anything which would constitute a default under any of the Landlord's obligations under the HUD Agreement. *Id.* A Lease default would occur if any of the covenants under the Lease were not kept. Debtor's Ex. No. 13. This included among other things, both the imposition of a mechanics lien on the Premises and the failure to maintain the paint of the Premises. *Id.* Under the terms of the HUD Agreement, the Landlord was not permitted to encumber the real property or the personal property constituting the Premises without prior written approval from the Secretary of HUD. Debtor's Ex. No. 15. The Landlord was required to keep the Premises in good repair and condition. *Id.;* Debtor's Ex. No. 13. In addition, the Landlord was not permitted to pay out any funds other than those used for reasonable operating expenses and necessary repairs

without the prior written approval of the Secretary of HUD. *Id.* If a default occurred under the HUD Agreement, HUD could foreclose the mortgage and/or take possession of the Premises. *Id.*

Because of an upcoming HUD inspection, Anthony Miner sought to have the interior Premises painted, and on July 2, 2001, All–Tech submitted a bid to the Debtor to perform the painting work. Debtor's Ex. No. 14. The bid did not contain credit or payment terms. *Id.* Anthony Miner hired All–Tech on behalf of the Debtor, and beginning in July 2001, All–Tech painted the interior of the Premises. According to David Zajack, an All–Tech project manager, All–Tech completed a substantial portion of the work in September 2001. All–Tech completed final work on the punch list items in November or December 2001. Prior to the painting work, All–Tech had done no other work for the Debtor and had no business relationship with either the Debtor or the Landlord.

During the period of July through September 2001, All–Tech submitted invoices to the Debtor related to the work: Invoice number 5670 dated July 31, 2001 in the amount of $8,646.50; Invoice number 5748 dated August 31, 2001 in the amount of $52,275.00; and Invoice number 5780 dated September 14, 2001 in the amount of $39,290.00 (collectively, the "Invoices"). Debtor's Ex. C to Complaint. Each Invoice indicated "current payment due." *Id.*

Under the terms of the HUD Agreement, the Landlord was required to establish and continue to maintain a reserve fund. Debtor's Ex. No. 15. This reserve fund was under the control of the mortgagee, Capstone Realty Advisors ("Capstone") and disbursements from the reserve fund could be made only on upon written consent from HUD. On September 17, 2001, Anthony Miner requested that HUD permit Capstone to release $158,385.43. All–Tech's Ex. No. 18. The request included the release of a total of $100,211.50 for three different All–Tech entries and indicated the item description for each as "painting." *Id.* On November 2, 2001, the Landlord received $200,087.18 from Capstone's release of reserve funds. All–Tech's Ex. No. 4. On November 5, 2001, this amount was transferred from the Landlord's bank account to the Debtor's bank account. All–Tech's Ex. No. 3.

On December 31, 2001, the Debtor issued a check to All–Tech in the amount of $100,211.50 (the "Transfer"). Debtor's Ex. A to Complaint. The Transfer was for payment on Invoice numbers 5670, 5748 and 5780, and satisfied the amount due and owing to All–Tech for the work performed as indicated on these Invoices. The Transfer check was drawn on the Debtor's account and made payable to All–Tech. *Id.* All–Tech accepted and retained the payment and did not issue a notice of lien to the Debtor or the Landlord and never recorded a lien against the leasehold estate or the real estate. The Transfer check was honored on January 7, 2002, and Anthony Miner testified that roughly the same time the Transfer was made, a lien waiver was sent to the Debtor. Debtor's Ex. B to Complaint. On January 4, 2002, per Anthony Miner's request, All–Tech executed the lien waiver. All–Tech's Ex. No. 7.

On March 5, 2003 the Debtor filed the instant complaint pursuant to 11 U.S.C. §§ 547 and 550 to avoid and recover the $100,211.50 Transfer by the Debtor to All–Tech as a preference. On April 9, 2003, All–Tech filed an answer and affirmative

defenses to the complaint.[1] A trial on the merits was held before the Court on March 22, 2004.

## III. *APPLICABLE STANDARDS*

A trustee, or in this case the Debtor, acting under 11 U.S.C. § 1107(a), may avoid certain preferential transfers made from the debtor's estate before the debtor filed a bankruptcy petition. *See* 11 U.S.C. § 547(b). Specifically, § 547(b) provides that:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt provided by the provisions of this title.

11 U.S.C. § 547(b).

Accordingly, § 547(b) provides that any transfer [2] of an interest of the debtor in property may be avoided if the transfer meets five requirements: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5) that enables the creditor to receive more than such creditor would receive if the case were a case under Chapter 7, the transfer had not been made, and the creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code. *See* 11 U.S.C. § 547(b); *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 564 (7th Cir.2001); *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1171 (7th Cir.1996).

---

1. The six asserted defenses are:

(1) The complaint fails to state a claim against All–Tech upon which relief can be granted.

(2) The Debtor's claims are barred under the ordinary course of business defense set forth in 11 U.S.C. § 547(c)(2).

(3) The Debtor's claims are barred under the substantially contemporaneous exchange defense set forth in 11 U.S.C. § 547(c)(1).

(4) The Debtor's claims are barred by the earmarking doctrine.

(5) The Debtor's claims are barred because the funds constituting the alleged preferen-

tial transfer are trust funds held for the benefit of All–Tech as set forth in the Illinois Mechanics Lien Act.

(6) The Debtor's claims are barred by virtue of All–Tech's status as a secured creditor, with its collateral constituting the Debtor's leasehold estate.

2. The Bankruptcy Code's definition of a transfer is "expansive," *Barnhill v. Johnson*, 503 U.S. 393, 400, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), and encompasses "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...." 11 U.S.C. § 101(54).

The moving party has the burden of proof to establish all elements of § 547(b) by a preponderance of the evidence. *See* 11 U.S.C. § 547(g); *In re Jones,* 226 F.3d 917, 921 (7th Cir.2000) (*citing In re Badger Lines, Inc.,* 140 F.3d 691, 698 (7th Cir.1998)). The Bankruptcy Code presumes the debtor to be insolvent, as a matter of law, during the 90 days prior to the bankruptcy petition filing date. 11 U.S.C. § 547(f); *see also Barash v. Public Fin. Corp.,* 658 F.2d 504, 507 (7th Cir.1981). This presumption requires the defendant to present evidence to rebut the presumption, but it does not relieve the plaintiff of the ultimate burden of proof on this third element to establish a prima facie case under § 547(b). *See In re Taxman Clothing Co.,* 905 F.2d 166, 168 (7th Cir.1990).

The power to avoid preferential transfers is designed to further the Bankruptcy Code's central policy of equality of distribution: "creditors of equal priority should receive pro rata shares of the debtor's property." *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). "Additionally, by preventing the debtor from favoring certain creditors over others and by ensuring an equal distribution, the preference provision helps reduce 'the incentive to rush to dismember a financially unstable debtor.'" *Warsco,* 258 F.3d at 564 (*quoting In re Smith,* 966 F.2d 1527, 1535 (7th Cir.), *cert. dismissed, Baker & Schultz, Inc. v. Boyer,* 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992)). "The purpose of allowing preferential transfers to be set aside is to prevent debtors who are tottering toward bankruptcy from playing favorites among their creditors, trying to keep alive a little longer by placating the most importunate ones." *In re Freedom Group, Inc.,* 50 F.3d 408, 410 (7th Cir.1995).

## IV. DISCUSSION

### A. The Elements of 11 U.S.C. § 547(b)(1)-(4)

The Court will first discuss whether the Transfer to All–Tech constitutes a preferential transfer under § 547(b). The parties do not dispute that the elements of § 547(b)(1)-(4) have been met. The parties agree that there was a Transfer of the Debtor's property in the amount of $100,211.50 to All–Tech. The Transfer satisfied an antecedent debt owed by the Debtor to All–Tech at the time of the Transfer. The Transfer occurred on December 31, 2001 and the check was paid on January 7, 2002, 29 days before the Debtor's February 5, 2002 filing of its Chapter 11 petition. The Transfer was for All–Tech's benefit and was made during the 90 day preference period before the Debtor filed its petition. The Code, specifically § 547(f), presumes the Debtor was insolvent during the 90 days before the February 5, 2002 petition date. *See* 11 U.S.C. § 547(f). No evidence has been offered to rebut that presumption.

### B. 11 U.S.C. § 547(b)(5): Was All–Tech a Fully Secured Creditor as of the Transfer Date?

The parties dispute the fifth element of § 547(b); whether All–Tech received more than it would have if the Debtor had filed a liquidation case under Chapter 7. All–Tech contends that it was a secured creditor and thus the Transfer did not enable it to receive more than it would have received in a liquidation case and therefore, there is no avoidable preference. The Court agrees.

In a Chapter 7 liquidation case, if a creditor is fully secured, it should receive the full value of its claim. *See* 11 U.S.C. § 506(a)-(c). Ordinarily, transfers to fully secured creditors are not preferential un-

less they exceed the value of the creditor's security interest. *Grabscheid v. Midwest Mech. (In re VIII Mich. Assocs.)*, 180 B.R. 202, 204 (Bankr.N.D.Ill.1995) (*citing In re Julien*, 168 B.R. 647, 659 (Bankr. W.D.Tenn.1994)). "A transfer is only 'preferential,' and thus recoverable, to the extent the transferee-creditor obtained more than it would have absent such transfer in a hypothetical liquidation." *Schwinn Plan Comm. v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.)*, 200 B.R. 980, 988 (Bankr.N.D.Ill. 1996) (*citing* 11 U.S.C. § 550(a); *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1196 (7th Cir.1989); *Knopfler v. Schraiber (In re Schraiber)*, 87 B 17144, 88 A 877, 1992 WL 280801 at *16 (Bankr.N.D.Ill. Sept. 14, 1992)). In order to determine whether a creditor is fully secured, the Court must determine whether the value of assets secured as collateral equaled or exceeded the value of the creditor's secured claim. *Schwinn*, 200 B.R. at 988. If so, the creditor would be fully secured, and entitled to 100% of its claim upon liquidation in a Chapter 7 case, and there would be no preference. *Id.* In this case, the subject collateral is the Debtor's interest in the leasehold of the Premises.

■ In order to determine the secured status and value of All–Tech's interest in the Premises on the Transfer date, the Court must look to state law. Bankruptcy courts generally look to state law to determine interests in property and perfection of liens therein. *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). In this matter, the Illinois Mechanics Lien Act, 770 ILCS 60/1 *et seq.* (West 2004) (the "Act"), applies.

■ First, the Court notes that an Illinois mechanics lien pursuant to the Act is a "statutory lien" as defined by 11 U.S.C. § 101(53). *In re Petroleum Piping Contractors, Inc.*, 211 B.R. 290, 299 (Bankr. N.D.Ind.1997) (*citing In re Saberman*, 3 B.R. 316, 318 (Bankr.N.D.Ill.1980); *In re Jennison–Wright Corp.*, 111 B.R. 146, 148 (Bankr.N.D.Ohio 1990) (applying Illinois law)). The lien extends to all interests that the owner has in the property improved by the lien claimant. *See* 770 ILCS 60/1. Section 101(53) defines a statutory lien as a "lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute." 11 U.S.C. § 101(53); *see also* 11 U.S.C. § 101(38). Pursuant to § 547(c)(6), a transfer that is the fixing of a statutory lien, such as a mechanics lien, may not be avoided. *See* 11 U.S.C. § 547(c)(6).

■ "The purpose of the … Act is to protect those who in good faith furnish labor or materials for construction of buildings or public improvements." Mechanics Liens in Illinois § 1.5 (Ill. Inst. for CLE, 2000) (*quoting Premier Elec. Constr. Co. v. Am. Nat'l Bank of Chi.*, 276 Ill. App.3d 816, 821, 213 Ill.Dec. 128, 658 N.E.2d 877, 883 (1st Dist.1995)) (*citing Lawn Manor Sav. & Loan Ass'n v. Hukvari*, 78 Ill.App.3d 531, 532, 33 Ill.Dec. 914, 397 N.E.2d 247, 248 (2d Dist.1979); *Petroline Co. v. Advanced Envtl. Contractors, Inc.*, 305 Ill.App.3d 234, 238 Ill.Dec. 485, 711 N.E.2d 1146 (1st Dist.1999)). The Act requires certain procedural steps to be taken to enforce and perfect an inchoate mechanics lien. Because such liens are created by statute, these requirements are to be strictly construed. *Delaney Elec. Co. v. Schiessle*, 235 Ill.App.3d 258, 265,

176 Ill.Dec. 280, 601 N.E.2d 978, 983 (1st Dist.1992).

While the Act does not specifically set forth the substantive prerequisites to an original contractor's lien, a reading of the case law and the statute establishes four requirements for the entitlement of a mechanics lien: (1) claimant has a valid contract; (2) claimant's contract is with the owner or with one knowingly permitted by owner; (3) claimant furnished certain lienable materials or labor; and (4) claimant has performed under its contract. *Delaney,* 235 Ill.App.3d at 264, 176 Ill.Dec. 280, 601 N.E.2d at 982. A mechanics lien claimant who has met the prerequisites for bringing a lien claim has merely acquired an inchoate right to a lien that attaches as of the date of the contract; it must then be perfected in accordance with the requirements set forth in the Act. *Id.* In order to perfect a mechanics lien, the contractor who furnished lienable labor or materials must give written notice of its claim within 90 days of the final delivery of the labor or material. Proper service of such written notice on the owner or the owner's agent is a condition precedent to obtaining and perfecting a mechanics lien claim. *Allied Bldg. Prods. Corp. v. Midway Airlines, Inc. (In re Midway Airlines, Inc.),* 91 B 06449, 91 B 06450, 91 B 06451, 1993 WL 243935 at *5 (Bankr. N.D.Ill. June 17, 1993) (*citing Knopfler v. Addison Bldg. Material Co. (In re Germansen Decorating Inc.),* 149 B.R. 522, 526 (Bankr.N.D.Ill.1993)). If the contractor is not paid within 10 days after notice is served, then within four months after completion of the labor the contractor must either: (1) file a verified mechanics lien claim in the county recorder's office; or (2) file a complaint to enforce its lien within two years after completion of the contract. *Id.* (*citing* 770 ILCS 60/7 and 60/28).

It is uncontested that the Debtor leased the Premises from, and under a Lease with, the Landlord. Moreover, the Landlord, pursuant to the HUD Agreement, and the Debtor, pursuant to the Lease, were required to maintain the Premises in good repair and condition. This included the interior paint of the Premises. The Debtor and All–Tech agree that they entered into an agreement, knowingly permitted by the Landlord, to perform the painting services on the Premises and the work was satisfactorily completed. A debtor's interest in property as a lessee is subject to an Illinois mechanics lien. *See In re California Steel,* 21 B.R. 383, 386 (Bankr.N.D.Ill.1982); *Fehr Constr. Co. v. Postl Sys. of Health Bldg.,* 189 Ill.App. 519 (1914). The Court finds that as of the Transfer date, the requirements of a valid inchoate mechanics lien had been met: (1) the Debtor and All–Tech had a valid contract; (2) the Landlord, pursuant to the Lease with the Debtor, knowingly permitted the Debtor to make improvements on the Premises; (3) All–Tech furnished lienable materials and labor; and (4) All–Tech did in fact paint the interior of the Premises. *See Delaney,* 235 Ill.App.3d at 264, 176 Ill.Dec. 280, 601 N.E.2d at 982. Thus, at the time of the Transfer, All–Tech had met the prerequisites for bringing a lien claim and thus had its inchoate right to a valid mechanics lien. Even though All–Tech had not perfected this right, it was secured to the extent of the labor and materials provided; in this case, $100,211.50.

At the time of the transfer, All–Tech had an inchoate mechanics lien on the Debtor's leasehold estate and on the Landlord's reversionary interest as owner therein. All–Tech was paid in full within two months of completing the work and thus had no need to give written notice or record a verified claim for lien, or

file suit to enforce and foreclose its mechanics lien. Indeed, to take any of those steps after being paid in full would have violated the Illinois statute and improperly clouded the title to the property.[3] If All–Tech had not been paid in full but had perfected its statutory lien prior to the petition date, it would have been effective against the Debtor's estate pursuant § 547(c)(6). Alternatively, if All–Tech had not been paid but perfected the lien subsequent to the petition date, the lien would likewise be effective against the estate because Illinois law provides that a mechanics lien relates back to the date of the contract when the inchoate lien arose. *Saberman*, 3 B.R. at 318 (*citing Decatur Bridge Co. v. Standart*, 208 Ill.App. 592, 595 (1917)); *In re Davicter Enters., Inc.*, 248 B.R. 794, 799 (Bankr.N.D.Ill.2000); *In re Petroleum Piping Contractors, Inc.*, 211 B.R. 290, 302 (Bankr.N.D.Ind.1997). Regardless of whether it was perfected before or after the petition date, if All–Tech had perfected the lien it would have been effective against the Debtor's estate under § 547(c)(6).

All–Tech did not, however, take the additional steps to perfect the lien. The Debtor argues that because All–Tech did not perfect its lien rights, it released any secured status it had. The

Court disagrees with this argument. All–Tech's claim was secured to the extent of its inchoate lien. It was paid in full and appropriately gave a release of its lien prior to the time necessary for any additional steps to be taken to perfect the lien. Thus, All–Tech's status as a secured creditor was unaffected. All–Tech was a secured creditor as of the Transfer date because it was secured by the materials furnished and labor it had performed in painting the interior of the Premises. The holder of an inchoate lien is a secured creditor.[4] *In re Bilinski*, Civ. A. 96–4268, 1998 WL 721083 at *3 (E.D.Pa. Oct.9, 1998). As the holder of an inchoate lien under Illinois law, which dated back to the date of the contract, All–Tech is a secured creditor within the meaning of the Bankruptcy Code.

At trial, David Zajack testified that All–Tech expected to be paid upon completion of the work. He further testified that at the end of a project, if All–Tech did not get paid, its practice was to call the contractor, and as further recourse if unpaid, it would put a lien on the property. He also indicated that in the past All–Tech had placed such liens on property where it had not been paid for completed work. Because All–Tech was paid for the work in the matter at bar, its inchoate lien was

---

**3.** Strict compliance with the mechanics lien statute is mandated, but where inchoate liens have been satisfied by timely payment, a contractor has no cause or need to record its verified claim for lien. In fact, if a mechanics lien claim has been paid or satisfied, the contractor whose claim has been paid may not bring a cause of action under the Act. If a verified claim for lien has been recorded and the claim has been paid, the claimant must deliver a written release of the lien claim within 30 days after payment or shall be liable to the owner for the sum of $100 as mandated by 770 ILCS 60/35. If a suit is brought after the claimant has been paid on the contract, a court may hold the contractor responsible for the amount of the owner's

reasonable attorney's fees. *See* 770 ILCS 60/17.

**4.** Section 101(37) of the Bankruptcy Code defines "lien" as a "charge against or interest in property to secure payments of a debtor or performance of an obligation." 11 U.S.C. § 101(37). Further, the legislative history of § 101(37) makes clear that term "lien ... includes inchoate liens." *Bilinski*, 1998 WL 721083 at *2, (*citing* H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 312 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 25 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5810 & 6269).

satisfied and All–Tech would have had no proper cause to record a lien on the Premises.

■ The Debtor further argues that even if All–Tech were a secured creditor as of the Transfer date, the Lease was of negative value because of the over $600,000.00 in unpaid back rent the Debtor owed to the Landlord, and therefore All–Tech could not have been a fully secured creditor entitled to 100% of its claim. The Debtor argues that the unpaid rent it owed the Landlord exceeded the balance of the separate debt the Landlord owed the Debtor for improvements to the property. The Court finds that those potentially off-setting debts do not establish or prove the value of the underlying leasehold. Moreover, the Debtor's continued operation conducted at the Premises made the assumption of the leasehold an integral part of its successful reorganization and the confirmation of its amended plan.

In support of its argument, the Debtor cites *Cocolat, Inc. v. Fisher Dev., Inc. (In re Cocolat)*, 176 B.R. 540 (Bankr.N.D.Cal. 1995), where the court assigned a zero value to the collateral of a lien, a candy store lease. That case is far from on all fours with this matter. In *Cocolat*, the parties presented conflicting evidence as to the value of the lease. *Id.* at 546. In this matter, neither party has presented sufficient evidence to establish the Lease value. Here, the Debtor has cited to its Schedules in support of its contention that the Lease had a negative value; there is no value assigned to the Lease in Schedule G. Debtor's Ex. No. 27. However, the Court finds this insufficient to establish that the Lease had a negative value. Even though the Debtor was in arrears on the Lease, the Court likewise finds this insufficient to establish that the leasehold had zero or less value. The Debtor presented no other

evidence establishing the Lease's alleged negative value.

All–Tech argues that simply because the Lease was assumed in the reorganization case, it did in fact have value. Neither party proffered sufficient evidence to establish the exact value of the Lease, and the Court inside a vacuum of evidence will not arbitrarily assign a precise value to the Lease. The Court finds that the Lease was worth at least the amount of All–Tech's claim for painting the Premises. The Lease had a monthly rent of $91,478.79, for a 20 year term. It began on January 24, 1996 and at the time of confirmation there were 13 years remaining on the Lease of the facility that was only five years old. Moreover, as part of the confirmed plan, the Landlord agreed to the assumption of the Lease and amortized its arrearage claim for a 15 year period without interest, commencing after the Debtor's general unsecured claims are satisfied under the plan. Accordingly, the Court can reasonably infer that the remaining value of this assumed long-term Lease was greater than All–Tech's lien claim, which was less than two months worth of base rent reserved in the Lease. Based on the amount of the rent, the length of the Lease term, the age of the facility and the nature of the Debtor's business, All–Tech was secured at least to the amount of its $100,211.50 claim. The Court finds that the Debtor has failed to meet its burden to establish that the Lease had insufficient value to satisfy the full value of All–Tech's mechanics lien claim of $100,211.50.

The Court finds that at the time of the Transfer, All–Tech was a creditor secured by the $100,211.50 worth of work it had performed for and materials supplied to the Debtor. All–Tech had an inchoate mechanics lien in the amount of $100,211.50. This inchoate lien was satisfied and paid in

full by the Debtor when it transferred this amount to All–Tech. If All–Tech had not been paid, it would have been a secured creditor on the petition date, entitled to the full value of its claim upon liquidation in a Chapter 7 case pursuant to § 547(b)(5). Because All–Tech was a fully secured creditor, the Transfer did not deplete the Debtor's estate and consequently did not diminish the assets available to meet the claims of other creditors pursuant to § 547(b). The Court finds that the Transfer was not a preference and thus, is not avoidable.

## C. Affirmative Defenses

Even though the Court finds that the Transfer was not preferential, because the parties devoted considerable efforts toward the applicability of the asserted affirmative defenses, the Court will address each one in turn.

### 1. Failure to State a Claim upon Which Relief May Be Granted

▮▮▮▮▮▮ All–Tech's first defense claims that the complaint should be dismissed on the ground that it fails to state a claim upon which relief can be granted. All–Tech has failed to refer to any particular count of the Debtor's complaint and has failed to notify the Debtor of any specific infirmities in the complaint. Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived. *See United States v. Lanzotti,* 205 F.3d 951, 957 (7th Cir.), *cert. denied,* 530 U.S. 1277, 120 S.Ct. 2746, 147 L.Ed.2d 1009 (2000) (collecting cases). The Court does not have a duty to research and construct legal arguments available to a party. *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11,* 46 F.3d 629, 635 (7th Cir.1995). Failure to cite any supporting case citation or authority results in failure of the point.

*See LINC Fin. Corp. v. Onwuteaka,* 129 F.3d 917, 921 (7th Cir.1997); *Pelfresne v. Vill. of Williams Bay,* 917 F.2d 1017, 1023 (7th Cir.1990). Based on All–Tech's failure to support its argument, the Court finds this defense legally insufficient and it is stricken.

### 2. Ordinary Course of Business

There are several statutory defenses under 11 U.S.C. § 547(c). Creditors who defend against a preferential transfer claim by invoking a statutory defense under 11 U.S.C. § 547(c)(1)-(8) have the burden of proving the nonavoidability of such transfers and such defenses under § 547(g). *In re Midway Airlines, Inc.,* 69 F.3d 792, 797 (7th Cir.1995). Pursuant to 11 U.S.C. § 547(c), a transfer may not be avoided

> (2) to the extent such transfer was–
>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

▮▮▮▮▮▮ All–Tech claims that pursuant to § 547(c)(2) it has a statutory defense to the Transfer because the Transfer was made in the ordinary course of business. All–Tech further claims that even though it did not have a prior relationship with the Debtor, the ordinary course of business defense is applicable. The ordinary course of business "exception was designed to 'leave undisturbed normal commercial and financial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of both the debtor and the debtor's transferee.'" *Kleven v.*

*Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir.2003) (citation omitted). In order to claim the ordinary course of business exception to a preference avoidance pursuant to § 547(c)(2), a defendant must prove, by a preponderance of the evidence, three distinct elements of the defense. *Midway Airlines*, 69 F.3d at 797. Where a transfer is (a) "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee," (b) "made in the ordinary course of business or financial affairs of the debtor and the transferee," and (c) "made according to ordinary business terms," it is insulated from avoidance. *Kleven*, 334 F.3d at 641–42 (*citing* 11 U.S.C. § 547(c)(2)(A)-(C)). Many decisions describe these requirements as comprising a two-pronged test that includes a subjective inquiry under § 547(c)(2)(A) & (B) as to whether the transaction was ordinary as between the parties, and an objective inquiry under § 547(c)(2)(C) as to whether the transaction was ordinary in the relevant industry examined as a whole. *See e.g., Midway Airlines*, 69 F.3d at 797-98; *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*, 238 B.R. 758, 775 (Bankr.N.D.Ill.1999). The Seventh Circuit has made it clear that the third element of the ordinary course of business defense refers to the range of terms that encompasses the practices of firms that are similar in some general way to the creditor. *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993).

In this case, All–Tech has not met its burden with respect to the three elements of the ordinary course of business defense. With respect to the first prong of the inquiry, whether the creation of the debt from the Debtor to All–Tech was ordinary as between the parties, both parties agree that prior to the painting work performed by All–Tech between July 2001 and September 2001, no relationship existed between them. In addition, All–Tech has cited *Kleven v. Household Bank F.S.B.*, 334 F.3d 638 to support its contention that even a first time transaction may be considered to be in the ordinary course of business for purposes of the statutory defense. In *Kleven*, the Seventh Circuit evaluated whether a transfer was in the ordinary course of business by examining whether the transaction was "ordinary" as between the debtor and creditor and also in the context of how the industry operates as a whole. *See Kleven*, 334 F.3d at 642; *Midway Airlines*, 69 F.3d at 795. In making this determination, the Seventh Circuit considered several factors: (1) the length of time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition. *Kleven*, 334 F.3d at 642 (*citing Barber v. Golden Seed Co.*, 129 F.3d 382, 390 (7th Cir.1997)).

The Seventh Circuit found that a first-time transaction is not per se ineligible for protection from avoidance under § 547(c)(2). *Id.* at 642. Even though the court found that a history of parties is the "strongest factor supporting a determination that the business between a debtor and an alleged preference creditor is ordinary," it is not necessary in every case. *Id.* There are instances where such ordinary course may be established by the parties' agreement. *Id.* at 643.

Even though the payment to All–Tech of the Transfer was pursuant to the parties' agreement, in this case, compliance with the first two elements of the defense alone is insufficient to establish that the Transfer occurred in the ordinary course under *Kleven*. Although the first element is undisputably met regarding the creation of

the debt in the ordinary course of this initial business between the parties, even considering the *Kleven* factors, the Court finds All–Tech has failed to establish all three elements required under the ordinary course of business defense. All–Tech did not proffer any evidence before the Court to establish any standard industry practice sufficient to warrant a "first-time" ordinary course defense application as contemplated by the Seventh Circuit in *Kleven.*

■■■ The Court also finds that All–Tech has failed to proffer any evidence regarding the objective inquiry under § 547(c)(2)(C) as to what firms similar to All–Tech had done with respect to payments from their customers in the relevant market; facilities for developmentally disabled adults and painting contractors. The record contains no evidence reflecting whether this payment transaction was ordinary within the industry examined as a whole. All–Tech argues that its manner of submitting progress billings and receiving payment at the end of the job was consistent with the Debtor's business experience with jobs involving contractors. Presumably, All–Tech intended this contention to establish that its manner of submitting progress bills to the Debtor indicates that there was in fact an established course of business consistent with industry practice. At trial, David Zajack testified that there are different courses of payment within the industry with respect to owner-projects and contractor-projects. He further testified that the payment request or cycle with the Debtor was consistent with the payment requests or cycles with other owner-projects. No other evidence was proffered to establish whether this was consistent with other similar entities in All–Tech's industry when dealing with customers similar to the Debtor. *See e.g., DeMert & Dougherty, Inc. v. ISP Techs.,*

*Inc. (In re DeMert & Dougherty, Inc.),* 232 B.R. 103, 110 (N.D.Ill.1999). The Court finds this evidence insufficient to establish the third prong or element of the ordinary course of business defense either between the parties or within the industry. All–Tech has failed to establish by a preponderance of the evidence all three elements of the ordinary course of business exception.

### 3. Substantially Contemporaneous Exchange

■■■ All–Tech also contends that the Debtor's claims are barred by the substantially contemporaneous exchange defense. 11 U.S.C. § 547(c)(1) states that a preferential transfer may not be avoided to the extent such transfer was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange...."

Anthony Miner testified that the lien waiver given to the Debtor by All–Tech was intended to be an integrated transaction. The lien waiver was executed on January 4, 2002 and the transfer occurred on December 31, 2001. David Zajack testified that All–Tech signed the lien waiver on the same day that it received the Transfer check. The check cleared on January 7, 2002. The Court need not determine whether this time frame was sufficient to constitute a "contemporaneous exchange" for purposes of § 547(c)(1). Even if the Transfer and the lien waiver were executed contemporaneously, the Court does not find that any new value was given to the Debtor as required by § 547(c)(1)(A). All the value given by All–Tech to the Debtor had been furnished previously while the painting labor and materials were supplied from July through

September 2001. The punch list work was completed in November or December 2001, and the Debtor did not pay until December 31, 2001.

■■■■ The new value defense protects transactions that do not diminish the bankruptcy estate. *Cocolat,* 176 B.R. at 548. A transfer does not diminish the estate if the debtor receives some new value on account of and equal to the amount of the transfer. The theory behind § 547(c)(1) is that, to the extent new value is offered, the preference is repaid to the estate. *In re Prescott,* 805 F.2d 719, 727 (7th Cir.1986). The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange. *Id.* Section 547(a)(2) states that "new value" means: "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2).

■■■■ "The contemporaneous exchange exception exists to protect 'transfer[s] that [are] not really on account of an antecedent debt.'" *Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop.),* 832 F.2d 997, 1003 (7th Cir.1987) (citation omitted). If a release resulting from settling a claim constituted new value and brought the payment within the exception, creditors would rush to settle for cash at the first indication of a debtor's financial trouble, enabling some creditors to receive more than they would in bankruptcy to the detriment of other creditors. *Id.* This was not Congress' intent with respect to the contemporaneous exchange exception. *Id.*

Further, a release is not likely of value to other creditors. *Id.* at 1004.

Here, All–Tech argues that the lien waiver was of value to the Debtor because the imposition of a mechanics lien on the property would have caused a breach of the HUD Agreement, which in turn would have caused HUD to demand the release of the lien or pursue its rights and remedies under the agreement. This suggests that All–Tech would have this Court view the lien waiver as the new value exchanged in consideration for the Transfer. The Court disagrees with this proposition because it was the work performed and materials provided by All–Tech that was the consideration for the Transfer, not the lien waiver. All–Tech has failed to proffer evidence to establish how the release of the lien constitutes new value; it has failed to meet its burden to establish that the lien waiver constituted new value. Accordingly, All–Tech's defense under § 547(c)(1) fails and the Court finds that the Transfer was not a substantially contemporaneous exchange for new value.

### 4. Earmarking

■■■■ All–Tech has also asserted that the Transfer was made with monies it received from HUD and that those funds were "earmarked" to pay the Invoices. The earmarking doctrine may apply where funds are given to a debtor which are intended for a particular party. *Steinberg v. NCNB Nat'l Bank of N.C. (In re Grabill Corp.),* 135 B.R. 101, 108 (Bankr.N.D.Ill. 1991) (*citing Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d, 1351, 1355–56, *reh'g denied,* 801 F.2d 398 (5th Cir.1986); *In re BNT Terminals, Inc.,* 125 B.R. 963, 970 (Bankr.N.D.Ill.1990); *In re Network 90 Degrees, Inc.,* 126 B.R. 990, 994 (N.D.Ill.1991)). The proper application of the earmarking doctrine involves consideration of four essential elements:

(1) existence of an agreement between the debtor and the new creditor for repayment of an antecedent debt; (2) the performance of this agreement by which the old creditor receives the agreed consideration; (3) the debtor's lack of dispositive control over the transferred property; and (4) the transfer's impact on the estate, namely whether the transfer depleted the debtor's estate. *Grabill*, 135 B.R. at 110 (citations omitted).

The Debtor was required, pursuant to the HUD Agreement, to maintain "replacement reserve funds" subject to HUD regulations. Permission from the Secretary of HUD was required in order for those funds to be disbursed. According to Anthony Miner, the funds in the replacement reserve belong to the Landlord, not to the Debtor. He further testified that prior to the Transfer, the Landlord requested from HUD that funds from the replacement reserve be released to satisfy a portion of the debt that the Landlord owed to the Debtor at that time. Capstone released $200,087.18 to the Landlord, pursuant to HUD authorization. Anthony Miner testified that the Landlord subsequently transferred the $200,087.18 to the Debtor, which the bank records show went into the Debtor's account from the Landlord's account to satisfy part of its debt to the Debtor. At that point, the Debtor was responsible for distributing the funds and it, not the Landlord, made the payment to All–Tech.

With respect to the first element of the earmarking defense, All–Tech proffered no evidence to establish that either HUD and All–Tech or the Landlord and All–Tech had agreed that repayment of the antecedent debt was to come directly from HUD. Although David Zajack testified that Anthony Miner asked if All–Tech would be willing to accept its payment from HUD, there was no evidence presented to sug-

gest that All–Tech had any agreement with HUD, the would-be new creditor, as required to establish an earmarking defense. All–Tech's adding of HUD to its insurance for the job at the Premises does not establish the existence of an agreement for payment from HUD to All–Tech as All–Tech suggests. The funds came to All–Tech from the Debtor; there was no new creditor relationship established. Even if the funds had come from the Landlord, there was no evidence of any agreement between the Landlord and the Debtor establishing a new creditor relationship. Because All–Tech failed to establish the first element, this Court need not address whether the old creditor received the agreed consideration.

The third element of the earmarking defense deals with whether the debtor had control over the earmarked property. "The foundation of the earmarking doctrine lies not in the relationship of the old and new creditors and the debtor, but in the debtor's control (or lack of control) over the assets which were transferred." *Network 90*, 126 B.R. at 994 (citation omitted). What is dispositive of the earmarking determination is whether or not the debtor had control over the funds. *Id.* at 995 (citations omitted).

The Court finds that the Debtor did have control over the earmarked funds. Because of the close relationship between the Debtor and the Landlord and their respective officers and partners, the Court finds that All–Tech has failed to establish that the Debtor lacked dispositive control over the funds after Capstone transferred them to the Landlord and the Landlord transferred them to the Debtor. Based on the evidence presented, the Court concludes that the funds in question came to the Debtor's account from the Landlord's account. This finding renders the earmarking defense inapplicable. The evi-

dence presented by All–Tech establishes that the sum released by Capstone was under the control of the Debtor. This is in part due to Anthony Miner's dual roles as both the general partner of the Landlord and the president and administrator of the Debtor. All–Tech failed to establish that the funds were out of the Debtor's effective control and were earmarked for All–Tech. To the contrary, the discrepancy in the amount of money Capstone released to the Landlord ($200,087.18), which the Landlord then transferred to the Debtor, and the amount due to All–Tech ($100,-211.50) further suggests that the Debtor was in fact in control of those funds and their distribution.

 The final element of the earmarking doctrine is whether the transfer depleted the Debtor's estate to the detriment of other creditors. The Court notes that such depletion of the estate would not negatively affect other creditors because the Court has found that All–Tech was a fully secured creditor and therefore would have received the full amount of its claim in a Chapter 7 liquidation case or in order for the reorganization plan to be confirmed.

#### 5. Other Defenses

All–Tech argues that the funds which constituted the Transfer were held in trust pursuant to the Act and are therefore not transferable. *See* 770 ILCS 60/21.02. All–Tech claims that the funds were held in trust subject to the execution of the lien waiver, and that because they were "trust funds," the Debtor was not in control of the funds. All–Tech proffered no evidence to establish this defense, and All–Tech agrees that there was no separate or segregated trust account holding the funds in trust for the benefit of All–Tech. The Court has already discussed its finding that the Debtor was in actual control of the funds.

In addition, All–Tech claims that the Debtor's action is barred by virtue of All–Tech's status as a secured creditor. The Court has previously discussed All–Tech's status as a secured creditor entitled to the full value of its claim and will not reiterate its discussion here.

### V. CONCLUSION

For the foregoing reasons, the Court finds that the Transfer was not a preference under § 547(b), and it is therefore not recoverable. Judgment will be entered in favor of All–Tech. The parties shall each bear their own costs and attorneys' fees.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

### ORDER

For the reasons set forth in a Memorandum Opinion dated the 11th day of May 2004, the Courts finds that the pre-petition transfer by Golfview Developmental Center, Inc. to All–Tech Decorating Company in the sum of $100,211.50 is not an avoidable preference under 11 U.S.C. § 547(b) and is not recoverable under 11 U.S.C. § 550(a).